# United States Court of Appeals
## For the First Circuit

No. 05-2602

ABDUL AZIMI,

Plaintiff, Appellant,

v.

JORDAN'S MEATS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, Senior U.S. District Judge]

Before

Lynch and Howard, Circuit Judges,
and Stafford,[*] Senior District Judge.

Michelle Allot, with whom Daniel Bates, John Lemieux, and Farris Law were on brief, for appellant.
Lawrence C. Winger for appellee.
Stephanie E.F. Jazlowiecki, with whom Jeffrey Neil Young, McTeague, Higbee, Case, Cohen, Whitney & Toker, P.A., Zachary L. Heiden, and Maine Civil Liberties Union Foundation, were on brief, for Maine Civil Liberties Union Foundation, amicus curiae.

August 3, 2006

---

[*] Of the Northern District of Florida, sitting by designation.

**LYNCH**, <u>Circuit Judge</u>.  A federal jury in Maine found that Abdul Azimi, a Muslim immigrant from Afghanistan, had suffered racial, religious, or ethnic harassment at his former workplace, Jordan's Meats, Inc., in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u>

The jury did not find that Azimi had suffered any harm for which it would award compensatory damages.  Azimi had put on no evidence of any out-of-pocket costs he had incurred for medical treatment or psychological counseling, or of any wages lost as a result of the abuse he suffered at his workplace; instead, he relied only on his own testimony and the testimony of his wife and a friend about his emotional distress -- testimony that the jury reasonably rejected as a basis for awarding compensatory damages.

On appeal, Azimi, supported by amicus Maine Civil Liberties Union Foundation (MCLUF), advances the argument that, as a matter of law, a finding of a hostile work environment requires that there be an award of compensatory damages, even if a jury has rejected plaintiff's causation-of-damages evidence.  This argument was long ago rejected by the Supreme Court.

Azimi also did not receive nominal damages.  That is because he did not ask for them in a timely fashion; he chose not to submit the question of nominal damages to the jury, and he waited far too long to request them from the district court.  He thus has forfeited the issue.  Azimi now asserts that nominal

-2-

damages must be awarded as a matter of law even if nominal damages were not timely requested. We reject the argument.

Because Azimi had not been awarded back pay, or compensatory damages, or nominal damages, the law of this circuit, at least with respect to his Title VII claim, is that he could not receive punitive damages. Although Azimi now wishes us to reconsider that rule, he failed to timely raise this issue with the trial court. Further, as to both his Title VII and § 1981 claims, he did not object to the jury instruction on punitive damages or to the special verdict form, both of which stated that punitive damages could not be awarded if compensatory damages were not. Indeed, his argument that punitive damages ought not be contingent on compensatory damages was not made until his motion for a new trial, which was denied by the district court.

Azimi now asks that we hold that in § 1981 cases, whatever the rule in Title VII cases, there is no prerequisite that there be nominal or compensatory damages before punitive damages may be granted. We decline to reach the issue; it, too, was not preserved.

Finally, Azimi contends that the district court erred in entering summary judgment for Jordan's Meats on Azimi's unlawful discharge claims. Azimi had argued that his discharge was discriminatory and that it was also in retaliation for his earlier complaints to the Maine Human Rights Commission (MHRC). The

district court found that Azimi had produced no evidence of pretext countering Jordan's Meats' explanation that it terminated Azimi's employment because he engaged in serious misconduct, including threatening a female co-worker in a dark parking lot. We affirm the district court's judgment in all respects. This case potentially raised a number of serious issues; none were preserved for appeal.

Where appropriate, we recite the facts in the light most favorable to the jury's verdict, Torres-Rivera v. O'Neill-Cancel, 406 F.3d 43, 45 (1st Cir. 2005), and discuss the pertinent facts with the issues raised.

I.

A.      Azimi's Claim for Compensatory Damages

Azimi was employed at the Jordan's Meats plant in Portland, Maine, from November 1999 to November 2001. During the period Azimi was employed, the company had about 150 full-time employees. Azimi worked in various positions while at the plant, including as a meat slicer and a meat stripper. At trial, Azimi testified that he had been the subject of discriminatory treatment and abusive and harassing behavior by some of his former co-workers and supervisors. The incidents of maltreatment are myriad and outrageous; we recite only a few examples.

On multiple occasions, one of Azimi's line leaders, Steve Mitton, physically obstructed the hot water tap so as to prevent

-4-

Azimi from washing his hands, which were swollen from handling frozen meat. While Azimi was only allowed access to the cold water tap, Mitton permitted other, white employees to use the hot water.

Subsequently, Azimi was transferred to another department. There, a co-worker, George Libby, made numerous disparaging comments to Azimi about his religion, including: "If you eat pork and pussy, you become strong like me." When Azimi told Libby that both oral sex and the consumption of pork were against his religion, Libby said, "fuck you and fuck your God; fuck your religion." On separate occasions, Libby, whom Azimi described as weighing about three hundred pounds, also grabbed Azimi by the neck and tried to shove pork into Azimi's mouth; held Azimi by the waist and pumped him from behind, simulating sexual intercourse; and told Azimi to "suck my dick" and, when Azimi took umbrage at the comment, picked Azimi up and dangled him, off the floor, by his arms, while other co-workers watched and laughed. Libby and another co-worker, Phil Ryan, also called Azimi on one of the phones in the plant and said to him, among other things, "Nigger, Sudan [sic] Hussein is waiting for you."

In addition to a number of other instances of verbal abuse and maltreatment by co-workers, Azimi was also subject to other offensive conduct, often by anonymous perpetrators. For example, he received an unsigned note in his locker; on one side of the note was scrawled a swastika and on the other side was written:

> Hey MotherFucker Why don't You GO BACK to your
> Own Country.
>
> You don't bE long HERE you Fucking musselum
> You PIECE of Shit WE <u>HATE YOU</u>
> ALL ThE MUSSELUMS
>
> You Don't don't bElong here AT JORDANSMEAT.
>
> YOUR NOTHing but a Fucking <u>NIGGER</u> . . . .

Azimi also once found pieces of pork in the pockets of his work jacket; found a picture in his locker of Osama Bin Laden, on which was written the words "Abdul," "Mother Fucker," and "Your Dad need [sic] Help"; and discovered that his goggles and hearing-protection equipment were smashed to pieces, and that his personal shoes had been taken from his work locker and stuck in the toilet.

Azimi testified that he reported the harassment to his supervisors; that Brian Smith, the Human Resources Manager, and other supervisors failed to adequately investigate the incidents and to impose appropriate punishment on the wrongdoers; and that the harassment continued despite his complaints and his supervisors' promises to address them.

After hearing the evidence, the jury found, by way of a special verdict form, that Azimi "was subjected to an offensive work environment that was hostile to his race, religion[,] or ethnic origin," and that Jordan's Meats "knew or should have known of the offensive hostile work environment and failed to take adequate and effective remedial measures." The jury, however, answered "no" to the question of whether "Defendant Jordan's Meats,

Inc.'s unlawful harassment legally caused [Azimi] to be damaged by emotional distress, pain, suffering, emotional anguish, loss of enjoyment of life[,] and/or inconvenience."[1]  As a result of this

_____

[1]     The special verdict form and the jury's answers read as follows:

1. Has Plaintiff, Abdul Azimi, proven by a preponderance of evidence that he was subjected to an offensive work environment that was hostile to his race, religion or ethnic origin?

Yes __X__  No _____

[If you answered Question 1 "YES," go on to Question 2. If you answered Question 1 "NO," then answer no further questions.]

2. Has Plaintiff, Abdul Azimi, proven by a preponderance of evidence that Defendant, Jordan['s] Meats, Inc., knew or should have known of the offensive hostile work environment and failed to take adequate and effective remedial measures?

Yes __X__  No _____

[If you answered Question 2 "YES," go on to Question 3. If you answered Question 2 "NO," then answer no further questions.]

3.    Has Plaintiff, Abdul Azimi, proven by a preponderance of evidence that Defendant Jordan's Meats, Inc.'s unlawful harassment legally caused Plaintiff to be damaged by emotional distress, pain, suffering, emotional anguish, loss of enjoyment of life and/or inconvenience?

Yes _____  No __X__

[If you answered Question 3 "YES," go on to Question 4. If you answered Question 3 "NO," then answer no further questions.]

4.    What amount is Plaintiff entitled to recover from Defendant as compensation for those damages found in answer to Question 3?

finding, the jury followed the district court's instructions and the special verdict form, and did not go on to consider what amount Azimi was entitled to recover as compensation for any injuries suffered. There were no objections to the special verdict form and the jury instructions, a point that we analyze later.

On appeal, Azimi's contention is that the jury was required to award compensatory damages, either as a matter of law or because the evidence compelled it.

Azimi, supported by the MCLUF, first argues that inherent in a finding of a hostile work environment is a finding that the claimant suffered damages, such that any liability finding must be

---

_____ ($\_\_\_\_\_.\_\_)
[Write out in words]       [Figures]

[Answer question 5.]

5.   Has Plaintiff, Abdul Azimi, proven by a preponderance of evidence that Defendant's supervisory or managerial personnel acted with malice or with reckless indifference to Plaintiff's federally protected right to be free from unlawful discrimination?

Yes \_\_\_\_\_ No \_\_\_\_\_

[If you answered Question 5 "YES," then answer Question 6. If you answered Question 5 "NO," then answer no further questions.]

6.   What amount of punitive damages should be awarded to Plaintiff?

_____ ($\_\_\_\_\_.\_\_)
[Write out in words]       [Figures]

-8-

accompanied by an award of compensatory damages.[2] Azimi and amicus present the issue as one of inconsistency in the jury verdict. They also argue that the importance of the interests at stake requires that there be an award of damages.

Both arguments have been repudiated by the Supreme Court. Indeed, in Carey v. Piphus, 435 U.S. 247 (1978), the Court rejected, in the context of a claim under 42 U.S.C. § 1983, the arguments (1) that injury should be presumed from the violation of a constitutional right and (2) that damages should be awarded for a deprivation of a constitutional right regardless of whether any injury was caused. See id. at 254. The Court noted that "[r]ights, constitutional and otherwise, do not exist in a vacuum," and that "[t]heir purpose is to protect persons from injuries to particular interests," such that without proof of injury, no compensatory damages are possible. Id. (emphasis added); see also Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 307 (1986)

---

[2]     This argument is predicated on the fact that to establish a case of hostile work environment under Title VII, a plaintiff must demonstrate, inter alia, "that the work environment was 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that [the plaintiff] in fact did perceive to be so.'" Conto v. Concord Hosp., Inc., 265 F.3d 79, 82 (1st Cir. 2001) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)). Amicus argues that "[i]t cannot be possible that the Jordan's Meats workplace was both objectively and subjectively offensive such that a reasonable person would find it hostile or abusive, and that Mr. Azimi in fact did perceive [it to] be so, and yet Mr. Azimi sustained no injury from that experience."

-9-

(noting that compensatory damages must be "grounded in determinations of plaintiffs' actual losses"); Carey, 435 U.S. at 264 ("[W]e hold that neither the likelihood of [mental and emotional] injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused.").

Carey establishes that there is no presumption of injury and no automatic entitlement to damages. Cf. Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1239 (11th Cir. 2000) (stating, in the context of reversing a class certification in a § 1981 case, that Carey "makes clear that in order to receive compensatory damages, individual plaintiffs must prove that 'injury actually was caused[,]'" and that "[t]his is especially true since compensatory damages under section 1981 can include damages for emotional and psychological distress").

In a later § 1983 case, the Court reiterated "that damages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages." Stachura, 477 U.S. at 310; see also id. ("Carey thus makes clear that the abstract value of a constitutional right may not form the basis for § 1983 damages."). That role, if it is to be played at all, is played by nominal damages. Id. at 308 n.11 ("[N]ominal damages, and not damages based on some undefinable 'value' of infringed rights, are the appropriate means of

-10-

'vindicating' rights whose deprivation has not caused actual, provable injury."). So, too, here.

Nor do Title VII or § 1981 provide statutory authority for automatic or presumptive damages. "The availability of noneconomic damages [under these causes of action] does not mean that their recovery is automatic whenever a plaintiff prevails." Lindemann & Grossman, 2 Employment Discrimination Law 1828 (3d ed. 1996). "An award of damages for emotional distress must be supported by competent evidence of 'genuine injury,'" Bailey v. Runyon, 220 F.3d 879, 882 (8th Cir. 2000) (some internal quotation marks omitted) (quoting Forshee v. Waterloo Indus., Inc., 178 F.3d 527, 531 (8th Cir. 1999)), the proof of which is distinct from the proof required to show discrimination, see id. (citing Browning v. President Riverboat Casino-Mo., Inc., 139 F.3d 631, 636 (8th Cir. 1998)); see also id. at 882 (rejecting the argument that emotional harm is "inherent" in a finding of liability for sexual harassment under Title VII, and noting that "[t]he Equal Employment Opportunity Commission (EEOC) has made clear that '[e]motional harm will not be presumed simply because the complaining party is a victim of discrimination'" (some internal quotation marks omitted) (second alteration in original) (quoting Vadie v. Miss. State Univ., 218 F.3d 365, 376 (5th Cir. 2000) (quoting EEOC Policy Guidance No. 915.002 § II(A)(2) (July 14, 1992)))); Lindemann & Grossman, supra, at 1828 ("To qualify [for noneconomic damages

-11-

under the employment anti-discrimination statutes], a plaintiff must prove that he or she sustained noneconomic injuries, such as emotional distress, pain and suffering, harm to reputation, and other consequential injury, caused by the defendant's unlawful conduct."). Injuries allegedly caused by the violation of Title VII or § 1981 must be proven to the factfinder -- here, a jury -- which may reasonably find, within the law, that while there has been harassment, the plaintiff has not been injured in any compensable way by it.[3] The district court quite correctly and succinctly noted that Azimi was improperly trying to eliminate causation of damages from the case.

---

[3] Azimi argues that Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), stands for the proposition that a plaintiff need not demonstrate any specific harm in order for a claim to be compensable, and that he was thus entitled as a matter of law to an award of compensatory damages. Azimi misreads Harris. That decision only speaks to what a plaintiff needs (or does not need) to show to obtain a liability judgment in a Title VII hostile work environment action. See id. at 22 ("Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." (citation omitted)). This appeal does not turn on that issue. Indeed, no challenge has been raised here to the jury's liability verdict, and there is no doubt that the jury reasonably found that Jordan's Meats subjected Azimi to an abusive working environment in violation of Title VII, regardless of whether Azimi demonstrated psychological injury. It is a separate question altogether, though, whether having made such a liability finding, the jury was required to award Azimi compensatory damages. There is nothing in Harris to override the ordinary rule that causation of damages must be proven to, and is the province of, the factfinder; if anything, Harris cuts against Azimi's argument, since it holds that a jury is entitled to find liability without necessarily finding psychological injury.

Azimi's alternative argument is that the jury's decision not to award him any compensatory damages is against the weight of the evidence. On that basis, he contends that the district court erred both in denying his motion for a new trial on damages and in refusing to reconsider that denial. We review the district court's denial of motions for a new trial and for reconsideration for abuse of discretion. Valentín-Almeyda v. Municipality of Aquadilla, 447 F.3d 85, 103-04 (1st Cir. 2006); Soto v. Flores, 103 F.3d 1056, 1063 (1st Cir. 1997). A district court "may grant a new trial only if [it is] convinced that the verdict is against the clear weight of the evidence, such that letting it stand would result in a miscarriage of justice." Valentín-Almeyda, 447 F.3d at 104. "In general, this rule applies to a verdict premised on a finding that no damages have been satisfactorily proven." Quinones-Pacheco v. Am. Airlines, Inc., 979 F.2d 1, 4 (1st Cir. 1992). "When evidence of damage is equivocal, or a reasonable jury could determine that the plaintiff failed to prove an essential element of his or her case (such as causation), returning a 'zero damages' verdict is acceptable and the non-award will be set aside only if manifest injustice is in prospect." Id.

As noted above, it was Azimi's burden to prove that he was injured by the hostile work environment at Jordan's Meats. The only testimony on compensatory damages he offered came from him, his wife, and a close friend from his mosque. Azimi testified that

-13-

the abuse he suffered at work caused him, inter alia, to become "stressed emotionally," to lose sleep and appetite, and to withdraw socially from his then fiancee (now wife), his son, and his friends.  Azimi's wife testified that, as a result of the workplace harassment, Azimi became hurt, quiet, and withdrawn; that he developed sleeping problems; and that their marriage became strained.  Azimi's friend also testified that during the time Azimi worked at Jordan's Meats, Azimi became "distressed[ and] sad" and did not "want to do anything."  None of these witnesses testified that Azimi sought medical treatment or counseling because of the harassment, that he suffered any out-of-pocket costs for such treatment or counseling, or that he lost any wages or paid time from work as a result of what happened at work.

Jordan's Meats presented evidence that Azimi instigated or participated in some of the ugly exchanges with his co-workers and that he engaged in off-color joking and teasing with at least one of his harassers; that Azimi sought a permanent position at Jordan's Meats and continued to work at the plant despite the harassment;[4] and that Azimi's wife sought work at Jordan's Meats in 2001, well after most of the harassing incidents of which Azimi complained at trial had taken place.

---

[4]    Azimi was hired in November 1999 as a temporary employee and did not become a permanent employee until July 2000.

The jury heard the testimony, and it was up to its members to evaluate it and the witnesses' demeanor and credibility. "'Translating legal damage into money damages -- especially in cases which involve few significant items of measurable economic loss -- is a matter peculiarly within a jury's ken'"; "[f]or just this reason, '[w]e rarely will override the jury's judgment on the appropriate amount of damages to be awarded.'" Milone v. Moceri Family, Inc., 847 F.2d 35, 37 (1st Cir. 1988) (second alteration in original) (quoting Wagenmann v. Adams, 829 F.2d 196, 215 (1st Cir. 1987); Brown v. Freedman Baking Co., 810 F.2d 6, 11 (1st Cir. 1987)); see also Quinones-Pacheco, 979 F.2d at 3 (noting that "a trial judge does not sit as a super-juror, free to disregard the considered verdict of a properly instructed jury 'merely because he disagrees with it or would have found otherwise in a bench trial'" (quoting Milone, 847 F.2d at 37)); Peckham v. Cont'l Cas. Ins. Co., 895 F.2d 830, 837, 839 (1st Cir. 1990) (observing that "[c]ausation questions . . . are normally grist for the jury's mill" and that the appellate court "cannot reject possibilities rooted in the record merely because, if sitting as factfinders, we [might] have drawn a different set of conclusions").

Although a reasonable jury could have awarded damages based on the evidence presented, there is no plausible argument that on these facts a reasonable jury was compelled to give a compensatory damages award. See Bailey, 220 F.3d at 880-81

-15-

(rejecting plaintiff's theory that jury was required to credit his evidence of emotional harm stemming from sexual harassment, and finding no abuse of discretion in trial judge's denial of new trial on damages); see also id. at 881 (noting that "'[m]edical or other expert evidence is not required to prove emotional distress'" and that "'[a] plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard,'" but that plaintiff was nonetheless "required 'to convince the trier of fact that [he] actually suffered distress because of the [Title VII violation] itself'" (alterations in original) (some internal quotation marks omitted) (quoting Kim v. Nash Finch Co., 123 F.3d 1046, 1065 (8th Cir. 1997); Price v. City of Charlotte, 93 F.3d 1241, 1250 (4th Cir. 1996))); cf. Beard v. Flying J, Inc., 266 F.3d 792, 803-04 (8th Cir. 2001); Walker v. Anderson Elec. Connectors, 944 F.2d 841, 843 (11th Cir. 1991).

B.        Nominal Damages And Punitive Damages

Azimi also appeals the denial of nominal damages. One might ask why the parties should care on appeal about whether a nominal damages award, for as little as one dollar, should be ordered.[5]

---

[5]      Defendants suggest that the lack of an award of nominal damages may be important to the issue of whether Azimi is a prevailing party for an award of attorney's fees. See Farrar v. Hobby, 506 U.S. 103, 114 (1992) (holding that an award of nominal damages makes a plaintiff a "prevailing party" within the meaning of 42 U.S.C. § 1988 and thus makes plaintiff eligible for attorney's fees). This circuit has yet to resolve whether a Title

-16-

The reason that a nominal damages award is significant here is because the law of this circuit is that no punitive damages may be awarded in a Title VII case in the absence of an award of compensatory damages or of nominal damages. We so held in <u>Kerr-Selgas</u> v. <u>American Airlines, Inc.</u>, 69 F.3d 1205 (1st Cir. 1995), <u>see</u> <u>id.</u> at 1214-15, and have reiterated the rule in dicta in subsequent cases, <u>see</u> <u>Rodriguez-Torres</u> v. <u>Caribbean Forms Mfr., Inc.</u>, 399 F.3d 52, 65 n.12 (1st Cir. 2005); <u>Campos-Orrego</u> v. <u>Rivera</u>, 175 F.3d 89, 97 (1st Cir. 1999); <u>Provencher</u> v. <u>CVS Pharmacy, Div. of Melville Corp.</u>, 145 F.3d 5, 11-12 (1st Cir. 1998) (noting <u>Kerr-Selgas</u>, but distinguishing it and allowing a punitive damages award to stand on the basis that although plaintiff had not been awarded compensatory or nominal damages, he had been awarded backpay).

In <u>Kerr-Selgas</u>, the rule that punitive damages were not available absent an award of nominal or compensatory damages was derived from the common law, not from the statutory language. <u>See</u> <u>Kerr-Selgas</u>, 69 F.3d at 1214 ("[G]enerally a claimant may not recover punitive damages without establishing liability for either compensatory or nominal damages." (citing <u>Cooper Distrib. Co., Inc.</u> v. <u>Amana Refrigeration, Inc.</u>, 63 F.3d 262, 281-83 (3d Cir.

VII and § 1981 plaintiff who wins a liability judgment and a declaratory judgment, but not a damages award, counts as a "prevailing party" within the meaning of 42 U.S.C. § 2000e-5(k) or § 1988. We express no view today on the issue.

-17-

1995); Restatement (Second) of Torts § 908 cmts. b, c (1979))).

The Kerr-Selgas rule has been criticized.  See, e.g., Cush-Crawford v. Adchem Corp., 271 F.3d 352, 357-59 (2d Cir. 2001) (disagreeing with Kerr-Selgas because, among other reasons, "[t]here is . . . no one common law rule" and "the statutory maxima capping punitive damage awards [under Title VII] strongly undermine the concerns that underlie the reluctance to award punitive damages without proof of actual harm").  And at least three circuits do not make punitive damages in Title VII and § 1981 cases contingent on there being an award of compensatory or nominal damages.  See Tisdale v. Fed. Express Corp., 415 F.3d 516, 534-35 (6th Cir. 2005); Cush-Crawford, 271 F.3d at 359; Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008, 1010-11 (7th Cir. 1998).  Indeed, only one other circuit appears to follow the Kerr-Selgas rule.[6]  See Louisiana ACORN Fair Hous. v. LeBlanc, 211 F.3d 298, 303 (5th Cir. 2000) (holding, in the context of a Fair Housing Act case, that punitive damages are not available, absent an award of actual

---

[6]     Four circuits have recognized the disagreement, but have avoided the issue on other grounds.  See Salitros v. Chrysler Corp., 306 F.3d 562, 575 (8th Cir. 2002) (reserving the question whether punitive damages are available in the absence of compensatory and nominal damages, because punitive damages could be predicated on front pay, which had been awarded); Corti v. Storage Tech. Corp., 304 F.3d 336, 341-43 (4th Cir. 2002) (allowing for punitive damages where there was an award of back pay); E.E.O.C. v. W&O, Inc., 213 F.3d 600, 615 & n.5 (11th Cir. 2000); Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 515 (9th Cir. 2000).

damages, except in cases where a violation of a constitutional right has occurred).

On appeal, Azimi would like to challenge the Kerr-Selgas rule and get a remand for a trial on punitive damages. He argues that 42 U.S.C. § 1981a, which sets forth damages available in certain actions under Title VII,[7] does not require compensatory or nominal damages to be awarded as a predicate to an award of punitive damages. Rather, he argues, that provision states only one precondition to an award of punitive damages: that "the complaining party demonstrate[] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). He also argues that the Kerr-Selgas rule applies only to Title VII cases and that this circuit has never addressed whether punitive damages were

_____

[7]    42 U.S.C. § 1981a(a)(1) provides:

In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964[, 42 U.S.C. §§ 2000e-5 or 2000e-16] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act[, 42 U.S.C. §§ 2000e-2, 2000e-3, or 2000e-16], and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

-19-

available, in the absence of compensatory or nominal damages, under § 1981. We do not address these arguments. His objections come too late.

Azimi did not object on the grounds articulated here to the jury instructions on punitive damages, either before or immediately after the jury was instructed. Nor did he object on these grounds to the special verdict form. Indeed, he did not raise a challenge to the punitive damages instruction until he filed his motion for a new trial on damages. He thus has forfeited the issue, see Fed. R. Civ. P. 51(b)(2), (c)(2) (stating that a party that has been informed of an instruction before the jury is instructed and before final jury arguments must object to the instruction on the record "before the instructions and arguments are delivered"); see also Fed. R. Civ. P. 51(d)(1)(A), if not waived it entirely. When the issue was finally presented in a motion for a new trial, the district court found that the claim came too late. The court also said correctly that it was bound by the Kerr-Selgas rule.

Had Azimi presented the issue in a timely fashion before the district court and preserved it for appeal, this panel would ordinarily also be bound by Kerr-Selgas.[8] But we do not address the question because Azimi did not timely raise the issue. For the

_____

[8] That is, we would be bound unless there is an intervening and contrary Supreme Court precedent. Azimi presents no argument that this is so.

same reason, we also do not address the question of whether punitive damages may be awarded in a § 1981 case in the absence of a compensatory or nominal damages award.

Azimi asks us to resort to plain error review. But plain error review would not help him here. It is hardly plain that the Kerr-Selgas rule is error. Moreover, as Azimi concedes, we have never addressed the rule in the context of a § 1981 case, so there is no plain error with respect to that argument either.[9]

Azimi did have an easy alternative if he wanted the jury to consider awarding him punitive damages: he could have asked for nominal damages in a timely fashion.

In situations in which an employer has been found to have violated the law, but the jury awards no compensatory damages, the Supreme Court has said in procedural due process cases that a district court ordinarily should award nominal damages. In Farrar v. Hobby, 506 U.S. 103 (1992), a case under 42 U.S.C. § 1983, the Court stated that a finding of a procedural due process violation unaccompanied by a finding of actual injury "obligates" a district

---

[9]     The Fifth Circuit, in LeBlanc, identified Kerr-Selgas as a § 1981 case. LeBlanc, 211 F.3d at 303 ("[I]n another 42 U.S.C. § 1981 case, the First Circuit held that a punitive damages award must be vacated absent either a compensatory damages award or a timely request for nominal damages."). It is clear from the context of the statement, however, that the LeBlanc court meant to identify Kerr-Selgas as a case under § 1981a (which sets out the damages available under Title VII), not § 1981.

court to award nominal damages. Id. at 112 (citing Carey, 435 U.S. at 266).

This circuit has adopted this rule of obligatory nominal damages, but we have thus far done so only for constitutional procedural due process claims. See Campos-Orrego, 175 F.3d at 98. Azimi asks that we extend the rule to cover his Title VII and § 1981 claims. He points out that at least one circuit has done so, at least with respect to a § 1981 claim; indeed, the Eighth Circuit has held that "proof of a Section 1981 violation automatically entitled [plaintiff] to nominal damages." Hicks v. Brown Group, Inc., 902 F.2d 630, 652 (8th Cir. 1990), vacated on other grounds, 499 U.S. 914 (1990). The Eighth Circuit rule, however, is not the rule of all the circuits; in fact, the Eleventh Circuit has expressly refused to extend Carey to Title VII claims. See Walker, 944 F.2d at 845 ("Nothing in Carey mandates the award of nominal damages for statutory violations."). Still, we will assume arguendo, and in Azimi's favor, that the rule set forth in Campos-Orrego, that proof of deprivation of procedural due process in a § 1983 action usually will lead to an award of nominal damages, extends to Title VII and § 1981 cases.

Regardless of whether an award of nominal damages is obligated in a Title VII and § 1981 case where liability has been found, a request for nominal damages may be forfeited, and has been forfeited here. This court has made clear that "[a]lthough nominal

damages are recoverable in intentional discrimination cases under 42 U.S.C. § 1981a(a)(1), . . . a liability verdict [does not] compel[] such an award absent a timely request." Kerr-Selgas, 69 F.3d at 1215; see also Campos-Orrego, 175 F.3d at 98 (noting that the entitlement to nominal damages is not "automatic" and that "it is incumbent upon the plaintiff to make a timely request for nominal damages"); accord Oliver v. Falla, 258 F.3d 1277, 1281-82 (11th Cir. 2001) (agreeing with our rule and citing cases).

In this circuit, a "plaintiff may request the judge to instruct the jury on nominal damages, or in the absence of such an instruction, may ask the trial court for nominal damages on the occasion of, or immediately after, the return of the verdict." Campos-Orrego, 175 F.3d at 99. Our rule is plaintiff-friendly in the sense that it does not require that plaintiffs make a strategic choice whether to ask for a nominal damages instruction. Indeed, there are good reasons why a plaintiff may choose not to give a jury the "out" of awarding nominal damages as an alternative to awarding compensatory damages. Azimi may have made such a tactical choice here, and he is bound by his choice.

If, as here, the plaintiff chooses not to give the jury the nominal damages question, then he or she must make a timely request to the court by requesting nominal damages "on the occasion of, or immediately after, the return of the verdict." Azimi, however, did not make a timely request that the court decide

-23-

whether nominal damages should be awarded.[10]  Indeed, Azimi did not clearly request nominal damages until July 26, 2005 -- three months after the verdict was returned on April 25, 2005.  That request for nominal damages came in his motion for reconsideration of the district court's denial of his initial motion for a new trial, and was presented only after the district court noted, in denying the motion for a new trial, that Azimi was not entitled to punitive damages, in the absence of an award of compensatory damages, because he had made no request for nominal damages.  In that same order, the district court correctly stated that even if such a request had been made in the initial motion for a new trial, the request would have been untimely anyway.

As a general rule, a plaintiff must make a timely claim for all damages he seeks.  This rule takes on special importance in cases like this one, in which the availability of one type of damages is conditioned upon the award of another.  There is a right

---

[10]  Azimi points out that his complaint requested "such further relief as deemed appropriate," and argues that this statement is tantamount to a timely request for nominal damages. There is nothing in this vague prayer for relief, however, that would compel the district court to award nominal damages or that would even give notice to the court that such damages were being sought.  Azimi also argues that in his reply to defendant's opposition to his motion for a new trial, he wrote: "[A]t a minimum, the court should award nominal damages in most cases.  At the very least, the court should do so in this case." Even if this perfunctory statement, articulated belatedly in a reply brief rather than in the motion for a new trial, would have been enough to put the court on notice of a nominal damages claim, the nominal damages request was still untimely.

to jury trial on damages, including punitive damages, in Title VII and § 1981 cases.  See 42 U.S.C. § 1981a(c)(1) (providing for jury trials in Title VII cases, so long as the complaining party is requesting compensatory or punitive damages); United States v. Burke, 504 U.S. 229, 240 (1992) ("42 U.S.C. § 1981[] permits victims of . . . employment discrimination to obtain a jury trial at which 'both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages' may be awarded."  (quoting Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 460 (1975))).  If the jury is to consider whether to award, and the appropriate sum of, punitive damages, then the issue must be submitted to the jury before it is discharged.  Cf. Walker, 944 F.2d at 845 (declining to reverse district court's failure to award nominal damages for a Title VII violation where plaintiff failed to submit the issue to the jury, in part because of "[t]he federal court's long standing policy against additur, as an intrusion on the jury's domain and violation of the Seventh Amendment").  This means that the question of whether preconditions for an award of punitive damages are met, such as the preconditions set forth in Kerr-Selgas, must be answered either before, on the occasion of, or immediately after the jury verdict.  In this case, both the motion for a new trial and the motion for reconsideration were filed long

after the jury ended its deliberations.  Azimi thus has forfeited his claim for nominal damages.[11]

II.

Grant of Summary Judgment
on the Unlawful Discharge Claims

We turn to Azimi's final argument: that his unlawful discharge claims should not have been resolved against him on summary judgment.[12]

The district court, after oral argument, adopted and affirmed the magistrate judge's recommended decision granting summary judgment in favor of Jordan's Meats on Azimi's unlawful discharge claims.  We review the court's grant of summary judgment de novo, Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 329 (1st Cir. 2005), drawing all reasonable inferences in favor of the non-movant, Nadherny v. Roseland Prop. Co., 390 F.3d 44, 48 (1st Cir. 2004).  "'Even in employment discrimination cases where elusive concepts such as motive or intent are at issue,' summary judgment is appropriate if the non-moving party rests

---

[11]    Azimi does not ask for plain error review of the nominal damages issue.  Regardless, there was no plain error here.

[12]    The magistrate judge's recommended decision, which was adopted by the district court, granted summary judgment on the merits of the unlawful discharge theory under Title VII, § 1981, and the Maine Human Rights Act (MHRA), Me. Rev. Stat. Ann. tit. 5, § 4551 et seq.  The recommended decision also held that Azimi had failed to exhaust his Title VII unlawful discharge claim, and Azimi did not challenge this determination before the district court.  Thus, technically all that is before us to review are the claims under § 1981 and MHRA for unlawful discharge.

-26-

'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (quoting Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)). "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting 'enough competent evidence to enable a finding favorable to the nonmoving party.'" LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993) (quoting Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993)).

In analyzing Azimi's unlawful discharge claim, we employ, as did the parties and the district court, a modified version of the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Rivera-García v. Sistema Universitario Ana G. Méndez, 442 F.3d 3, 5 (1st Cir. 2006). Under this framework:

> a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of discrimination or retaliation. If he does so, then the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]," sufficient to raise a genuine issue of fact as to whether it discriminated against the employee. . . . If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliat[ion or discrimination] . . . .

<u>Hodgens</u> v. <u>Gen. Dynamics Corp.</u>, 144 F.3d 151, 160-61 (1st Cir. 1998) (first alteration in original) (citations omitted) (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802).

Jordan's Meats does not argue that Azimi failed to make out a prima facie case of unlawful discharge; rather, it contends that Azimi failed to produce sufficient evidence to allow a reasonable jury to conclude that his firing was a pretext and was actually motivated by retaliation or discrimination. We thus assume that Azimi has made out a prima facie case and go directly to the issues of pretext and motivation.

Jordan's Meats produced admissible evidence that Brian Smith, the Human Resources Manager, and Russell Cram, Azimi's immediate supervisor, jointly made the decision to discharge Azimi after he engaged in five related acts of what the company perceived to be "serious misconduct." Specifically, Smith's affidavit listed the following incidents as having led to the termination of Azimi's employment: (1) Azimi threatened and intimidated a female co-worker, Mercedes Manning, while she was alone in a dark parking lot at 6 a.m. before work; (2) Azimi attempted a second time to approach Manning in the parking lot; (3) Azimi lied when confronted with Manning's allegations; (4) Azimi made a false allegation against co-worker Harry Adams; and (5) Azimi threatened Adams in the presence of their supervisor, Russell Cram. Smith stated that Jordan's Meats "would never let -- and . . . had never let -- any

employee get away with the kind of misconduct engaged in by Mr. Azimi."

Smith's affidavit was supported by, inter alia, business records of Jordan's Meats,[13] see Fed. R. Evid. 803(6), which consisted of contemporaneous notes, which were taken by two staff members of the Human Resources Department at the meeting in which Manning reported that Azimi threatened her, and which detail Manning's allegations and the staff members' personal observations of Manning's demeanor; a signed statement from Manning reiterating her allegations against Azimi; a signed statement from Cram, who was Azimi, Adams, and Manning's immediate supervisor, stating his firsthand observation of Azimi "angrily threatening [Adams]," as well as other reasons for his recommending that Azimi be fired; and a written record of the company's investigation of, and response to, two complaints made by Azimi of what the company characterized as "minor" harassment by co-workers.

We initially describe Manning's complaints against Azimi about two incidents, one on November 8 and another on November 12, 2001. We focus on the Manning incidents for several reasons.

_____

[13]     Azimi vaguely suggests that defendant's evidence was not admissible, Hodgens, 144 F.3d at 160, because it constituted hearsay evidence. The argument is insufficiently developed, and we thus consider it waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In any event, Azimi offers no response to Jordan's Meats' rejoinder that the exhibits were business records, see Fed. R. Evid. 803(6), and that they and the affidavit were submitted to prove not the underlying events but the information Smith had at the time he made his decision to terminate Azimi.

First, Azimi's opposition to summary judgment did not deny that Manning made those allegations against him and did not argue that Manning had any reason to falsely accuse him. Second, no inference of pretext can be raised from the company's response to Manning's complaint. Jordan's Meats' investigation into Manning's allegations, which was conducted in large part by persons who had no prior history with Azimi, was reasonable and led the company to conclude that Manning was credible and that Azimi was not. The severity of the discipline that Jordan's Meats meted out as a consequence -- termination of employment -- does not itself raise any inference of pretext or of discrimination or retaliation. Third, Azimi has produced no evidence of disparate discipline to show that other employees who engaged in equivalent conduct of physically intimidating and also threatening a vulnerable female co-worker in order to induce her to lie and then lying about it were not terminated.

Manning's charge was that Azimi confronted her while she was alone in the dark parking lot at 6 a.m. on November 8 and demanded that she substantiate his version of an altercation that had occurred between him and Adams, which Manning had witnessed the day earlier. According to Manning's signed statement, Azimi "threatened that if [she] did not tell the boss what [Azimi] wanted that [Azimi] would tell the supervisor that Adams touches himself in front [of her] (demonstrated by grabbing his crotch) and that

Adams touches [her] in a sexual way."  Manning stated that Azimi's accusations were untrue and that Adams had never touched her or himself in her presence.

According to Manning's statement, after Azimi threatened her in the parking lot, Manning "did not know what to do." Therefore, that very day, she confided in a fellow co-worker, Estaban Batista.  At Batista's encouragement, Manning reported the incident to her supervisor, Cram, the next morning, which was Friday, November 9.  After telling Cram her account of the events, she was interviewed, in Cram's presence, by two members of the Human Resources Department, Sonya Voutour and Trish Thorpe.  Also present at the meeting was Norma Finnegan, Manning's co-worker, who translated for Manning, whose first language is Spanish.  Voutour's contemporaneous notes, from which we quote, give Manning's account of the November 8 incident:

> At approximately 6:10 am on Thursday, November 8, 2001[,] Mercedes arrived at the parking lot across the street from Amatos.  Abdul Azimi was in the parking lot and came up to her car as she pulled into the parking lot.  Abdul told Mercedes to park her car in this spot. Mercedes was frightened and said, NO and that she would park on the other side of the parking lot.  Abdul kept insisting that she park her car here.  Mercedes parked on the other side still.  Abdul came up to where she parked her car and walked with her to the building.  Abdul told her that she must tell her supervisor, Russ Cram[,] that Harry Adams used a "Bad Word" when they were arguing yesterday (Wednesday).  Mercedes told him that the problem was between Harry and himself (Abdul) and not with her.  Abdul frightened

her by insisting that she must tell Russ Cram that Harry used a "Bad Word" with Abdul during the incident. Mercedes asked why he was getting her involved with a problem between Harry and himself (Abdul). Abdul told Mercedes that if she did not tell Russ that Harry used a "Bad Word" with Abdul then he would say bad things to people. Mercedes demonstrated the gesture Abdul used when saying the next line. Mercedes lifted her sweatshirt up a bit and grabbed for her crotch area. Abdul told her that he would tell people that Harry would grab himself, in a sexual way, and point it toward Mercedes. He (Abdul) would also tell people that Harry would grab Mercedes in a sexual way. Mercedes told Abdul that it wasn't her problem[,] and the problem was between Harry and himself (Abdul).

Other contemporaneous notes by Thorpe of the meeting are consistent with Voutour's and add that "Mercedes was visibly upset and near tears many times" as she told her story. Thorpe also noted that Manning said that she told Azimi that she did not hear Adams say what Azimi accused Adams of saying and asked Azimi why he "wanted his problem to be her problem." Thorpe also noted that Manning denied that Adams had ever touched her, and said that she was happily married. Finally, Thorpe noted that "Mercedes stated that she was worried about coming into work because it is dark when she arrives," and that Cram told Manning that he would make sure that someone would be there to escort her into the plant in the morning.

In sum, Manning told the Human Resources Department that she was afraid of Azimi, and to others she appeared genuinely

afraid. Manning also told the Human Resources Department and reiterated in her own signed statement that Azimi insisted that she get involved in his problems, that Azimi told her to lie, and that when she refused, Azimi threatened to disseminate lies about her and Adams concerning the sensitive topic of sexual conduct. It is self-evident that Azimi's threatened statements would cause serious problems for Manning with her husband, with Adams, and in her workplace.

According to Manning's statement, on Monday, November 12, the next work day after she reported the incident with Azimi to her supervisor and the Human Resources Department, she saw Azimi sitting in his car in the same parking lot, with his car's lights off and engine running, which caused her to be "afraid" that he was planning to confront her again. According to Smith's deposition, a supervisor had to go to the parking lot and escort Manning into the plant. As a result of the incidents, Manning said that she filed a complaint against Azimi with the Portland Police Department shortly after the November 12 incident.

Jordan's Meats placed Azimi on indefinite suspension while the company initiated an investigation of Manning's allegations, and, the record shows, Azimi was eventually terminated on November 19, 2001, ten days after Manning made her initial complaint. According to Smith's deposition, as part of the investigation, Smith, who was out of town on November 8 and 9,

personally interviewed Manning when he returned to the plant on November 12. Manning repeated to Smith the allegations against Azimi and told Smith of her plans to file a police report about the incident. Smith stated in his deposition that the police did, in fact, follow up on Manning's allegations.

A few days after speaking with Manning, Smith and Cram interviewed Azimi. According to Smith's affidavit, Azimi "repeatedly and strongly denied any and all wrongdoing and gave exculpatory explanations for his parking lot conduct (i.e., that he was just there smoking a cigarette and not waiting for Ms. Manning[,] that Ms. Manning's English is so poor that he could not possibly have threatened her as she claims, and she must have misunderstood what happened)."

Smith explained that he ultimately credited Manning's account for several reasons. According to Smith's affidavit, he and his staff spoke directly with Manning, and from personal observation, he noted that Manning, whom he described as "a small, vulnerable, Hispanic woman," struck him as genuinely "terrified" of Azimi. At his deposition, Smith said that he was convinced that Manning did, in fact, understand what Azimi had said to her that day in the parking lot, because Smith himself had engaged in conversations in English with Manning and it was his experience that "[s]he can understand [English] a lot better than she speaks it." Smith also testified that Cram had told him that Manning's

account was corroborated 'almost verbatim' by someone else. In fact, Smith's impression was that Cram had told him that this other source was Azimi himself. Finally, Smith noted that Manning was not involved in any of the previous incidents of harassment complained of by Azimi.

In addition to Manning's allegations, Smith also relied on as grounds for terminating Azimi the signed statement by Cram, in which Cram detailed a number of other reasons, in addition to the incidents with Manning, why he supported terminating Azimi's employment. Of particular significance to Smith was Cram's statement that "on the afternoon of November 7, 2001 in my office and in my presence, [Azimi] very angrily threatened another male team member [Adams] to settle things outside." Cram said that he was "concerned and frightened" by "the terrifying expression on . . . Azimi's face and in his eyes when he" made this threat. Cram also noted that "Azimi had a history of not being cooperative with" co-workers and that "[m]any allegations were made against . . . Azimi, but he always denied any wrong doing." Finally, Cram stated that "there have been credibility issues" with Azimi. As an example, Cram said that one of Azimi's co-workers had reported that an anonymously written racist note that Azimi found in his locker was actually planted by Azimi himself; the co-worker "explained in vivid detail that . . . Azimi had showed him the note and admitted he had planted it." Smith confirmed at his deposition that the

employee, Kurt Chim, had indeed come forward in February 2001, about a year after Azimi complained about the note, and told Smith that he had talked with Azimi, that Azimi had admitted placing the note in his own locker, and that Azimi believed the planting of the note would help him get hired full time. Chim, whom Smith found credible, explained that he had not wanted to get involved initially because he did not want to be perceived as a "rat." Chim also told Smith that he had gone to high school with Azimi and that it was his opinion that Azimi had always been a dishonest person.

Whether Azimi told the truth about the Manning and Adams incidents is not the point. Jordan's Meats had a substantial basis for concluding that Azimi was not credible and had engaged in the misconduct charged.

In response to these specific reasons that Jordan's Meats offered for terminating him, Azimi offered only the following evidence in support of his opposition to summary judgment: (1) his own deposition testimony, which he characterizes as denying Manning's allegations; and (2) an administrative decision by the Maine Department of Labor (MDOL) regarding his eligibility for unemployment benefits. He also relies on two other arguments: (1) that he was terminated for his misconduct, while others were not disciplined for what he claims was equivalent misconduct; and (2) that he was fired nine months after he filed his second complaint

with the MHRC and two months after the September 11, 2001 attacks. We consider each in turn.

Azimi's opposing statement of material facts merely offered this conclusory allegation:

> In retaliation for Mr. Azimi's charges of discrimination filed [with] the Maine Human Rights Commission and as a further act of discrimination, Defendant discharged Plaintiff on false grounds on November 19, 2001. Azimi Deposition at 249-264.

The referenced deposition pages do not refute the employer's explanation about believing what Manning and Cram said had happened. Those pages merely recount Azimi's version of the November 8 incident, which was that he was smoking a cigarette by his car in the parking lot when Manning approached him and said "I am sorry" and something about "Harry Adams"; that Azimi did not understand what Manning was saying because she was speaking Spanish; that the only thing he said to Manning was that she should "talk to Russell"; and that he and Manning walked into the plant together. Azimi did not deny that Manning made the complaints against him, did not explain why the account that Manning gave on a consistent basis each time she described it differed so much from his own, and did not give any reason why Manning would lie to her employer about what happened in the parking lot.

Azimi's denial of wrongdoing is not enough to raise an inference of pretext, on these facts, where the company undertook a reasonable investigation, heard his side of the story, and

decided that his accuser's was more credible. "In assessing pretext, a court's 'focus must be on the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible," subject to some limitations not present here. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) (quoting Gray v. New Eng. Tel. & Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986)); see also Rivera-Aponte v. Rest. Metropol #3, Inc., 338 F.3d 9, 11-12 (1st Cir. 2003) ("Whether a termination decision was wise or done in haste is irrelevant, so long as the decision was not made with discriminatory animus."). Although an "employer's good faith belief is not automatically conclusive," Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 46 (1st Cir. 2002), "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real [and unlawful] motive" of discrimination, Mesnick, 950 F.2d at 824 (internal quotation mark omitted) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir. 1990)). Azimi has not made that showing here.

Azimi also relies on a decision from an unemployment benefits hearing before the MDOL, in which the MDOL concluded that Jordan's Meats had not met its burden of proving that Azimi was ineligible to receive certain unemployment benefits because he had

engaged in misconduct within the meaning of Me. Rev. Stat. Ann. tit. 26, § 1043(23)(A)(10).  See Me. Rev. Stat. Ann. tit. 26, § 1193(2) (disqualifying a claimant "discharged for misconduct connected with his work" from benefits for a certain period of time).  Azimi observes that the MDOL had reached its decision in large part because it determined that Manning's English skills were so limited as to undermine Jordan's Meats' account of the parking lot incident.  Azimi argues that the MDOL's reasoning is enough to raise a material dispute of fact about the credibility of Jordan's Meats' explanation for terminating him.

The MDOL decision, however, does not in its conclusion or rationale help him.  That decision merely found the employer had not "prove[d] that [Azimi's] conduct [met] the statutory definition of misconduct."  It did not address or find that Jordan's Meats had no reasonable basis to believe that Azimi had engaged in misconduct or even that Manning herself was not credible; in fact, the MDOL specifically noted that Manning, who was called to testify, "testified that she felt threatened by the encounter in the parking lot."  Nor did the MDOL even purport to address the questions of whether Azimi had been more harshly disciplined than a similarly situated employee, or, if so, whether the difference in treatment was motivated by an intent to discriminate or retaliate.

In contrast, at the summary judgment stage, it is up to Azimi to produce sufficient evidence to generate a material dispute

of fact that Jordan's Meats' articulated reasons for firing him were pretext. Most importantly -- even if Azimi were to show that he did not, in fact, threaten Manning and, further, that Jordan's Meats knew that he did not and fired him anyway -- Azimi still must produce sufficient evidence from which a jury could reasonably infer that the real reason Jordan's Meats fired him was because of discrimination or retaliation.

Azimi argues that a jury could reasonably infer that Jordan's Meats was motivated by discriminatory or retaliatory animus, because he was terminated for his misconduct while other employees were disciplined more leniently for similar misbehavior. There were four types of misconduct leading up to the termination decision, according to Smith: (1) the two incidents in the parking lot with Manning; (2) lying about the Manning incident; (3) making false allegations against Adams; and (4) threatening Adams in the presence of Cram. This case does not involve, as Azimi seems to argue, only the third and fourth categories of misconduct. This case involves, in addition to those two categories, intimidating a female co-worker in a dark parking lot, threatening to spread rumors about her if she did not lie, and putting her in genuine fear. Azimi has provided no evidence of comparable misconduct and has not met his burden of providing evidence that the employment of co-workers who had committed misconduct similar to that act or that combination of acts were not also terminated.

In his statement of material facts, Azimi refers to Jordan's Meats' failure to terminate the employment of co-workers whom he accused of calling him names and using off-color or obscene language. Use of such language, not uncommon on a meat-processing plant floor, is simply not similar to the conduct in which Azimi was reported to have engaged. More serious are his claims that George Libby engaged in inappropriate roughhousing by "grabb[ing Azimi] hard by the waist [and] thrusting his [Libby's] groin into [Azimi's] buttocks," and that Azimi felt threatened when another co-worker said that she was going to break his "fucking teeth out." That Jordan's Meats, which investigated the incidents, concluded that neither Libby's conduct nor an angry exchange between mutually abusive co-workers was the equivalent of the behavior for which Azimi was terminated does not raise an inference of discrimination. Indeed, Jordan's Meats had reason to believe that Azimi may have been the instigator of some of these verbal and physical exchanges.

In fact, there was undisputed evidence in the summary judgment record that at least one co-worker, Libby, complained that Azimi himself had directed verbal insults and physical conduct toward Libby, which was offensive and threatening. Yet Azimi was not disciplined as a result. Libby complained to Smith that Azimi had called Libby names, such as "fat ass"; that Azimi also had grabbed him from behind and humped him; that Azimi had "on many

times" tried to grab him and restrain him; and that Libby was afraid of Azimi.

The record shows that Jordan's Meats did, in fact, discipline Libby and other co-workers whom the company found to have harassed Azimi. The female co-worker who threatened to break Azimi's teeth was issued a warning; Libby was suspended for three days for his harassment of Azimi and would have been terminated if his conduct had not improved; and another co-worker, Phil Ryan, was suspended for one day for phoning Azimi and making racist comments, after Ryan said Azimi called him "a fat ass" and told him that he was going to "cut his fat ass."

Nor does Azimi offer any evidence from which a jury could reasonably infer that the individuals who made the decision to terminate him -- specifically, Smith and Cram -- harbored any type of discriminatory or retaliatory animus toward him. That Smith, as the Human Resources Manager, and Cram, as Azimi's supervisor, dealt with some of Azimi's complaints of pre-termination harassment, is not enough to allow the inference that they terminated him because of unlawful animus.[14] In fact, the evidence in the record tends to

_____

[14] Azimi does not argue that any of his harassers was involved in the decision to terminate him. See Medina-Munoz, 896 F.2d at 10 ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."). Nor does Azimi allege that this is a case like Cariglia v. Hertz Equipment Rental Corp., 363 F.3d 77 (1st Cir. 2004), in which a neutral decisionmaker is induced to act based on inaccurate information provided because of the provider's discriminatory animus. There is no claim that Manning or Adams

-42-

show that Smith and Cram were sympathetic to many of Azimi's complaints and were trying to stamp out any discrimination at the company. For example, according to Smith's deposition, when Azimi found the note in his locker in 1999, Smith undertook an investigation. He even forwarded the note and handwriting samples to a handwriting expert, who could not identify the author. Smith then had several meetings with small groups of employees on three shifts, informed them that the letter was despicable and that such conduct would not be tolerated in the company, and distributed a memo he wrote on workplace behavior and diversity awareness.

Finally, Azimi suggests that a reasonable factfinder could infer animus from the fact that he was fired within nine months of the filing of his second complaint with the MHRC and within two months after the September 11, 2001 attacks on the World Trade Center and other targets. Nine months is simply too long a time lapse to support an inference of retaliatory animus. When Azimi has proffered no additional evidence of discriminatory animus on the part of Smith or any other decisionmaker, the fact that he was fired two months after September 11 also is not enough to generate a material dispute of fact on the unlawful discharge theory.

---

were biased against Azimi because of his race, religion, or ethnicity. The record shows that Manning, Adams, and Azimi had a cordial relationship prior to the events of November 7, 2001.

Drawing all reasonable inferences in Azimi's favor, we conclude based on our review of the summary judgment record that summary judgment was warranted in relation to the unlawful discharge claims.  The law does not protect the jobs of those who threaten other employees with harm, even if they themselves have been mistreated.  That Azimi was wronged gave him no right to do wrong.

### III.

Judgment <u>affirmed</u>.  Each side shall bear its own costs.