**Tonia L. CUSH–CRAWFORD, Plaintiff–Appellee–Cross–Appellant,**

v.

**ADCHEM CORP., Defendant–Appellant–Cross–Appellee.**

**Nos. 00–7617, 00–7745.**

United States Court of Appeals, Second Circuit.

Argued Jan. 18, 2001.

Decided Nov. 16, 2001.

Ira G. Rosenstein (Siobhan A. Handley and Cathleen O'Donnell, on the brief), Orrick, Herrington & Sutcliffe LLP, New York, NY, for defendant-appellant-cross-appellee.

Charmaine M. Stewart, Esq. (Nadira Stewart, on the brief), Elmont, NY, for plaintiff-appellee-cross-appellant.

Julie L. Gantz (C. Gregory Stewart, Philip B. Sklover, and Vincent J. Blackwood, on the brief), Equal Employment Opportunity Commission, as amicus curiae in support of plaintiff-appellee.

Before NEWMAN, LEVAL, and SACK, Circuit Judges.

LEVAL, Circuit Judge.

Defendant Adchem Corporation appeals from the judgment of the United States District Court for the Eastern District of New York (Arthur D. Spatt, J.), entered after a jury verdict in favor of plaintiff Tonia Cush–Crawford on her claim for sexual harassment-hostile work environment brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Plaintiff cross-appeals from the judgment insofar as it failed to award compensatory damages. We find no error requiring reversal. We write to clarify that in this Circuit a Title VII plaintiff may recover limited statutory punitive damages absent an award of either actual or nominal damages.

## BACKGROUND

On June 16, 1993, defendant Adchem hired plaintiff Tonia Cush–Crawford as a laboratory technician. Adchem owned and operated two adhesive tape manufacturing plants in Westbury and Riverhead, New York, employing approximately 150 persons.

Cush–Crawford was hired to work at the Westbury plant, where she reported to a laboratory supervisor named Collin Mars. Mars had interviewed Cush–Crawford for the position. Cush–Crawford testified that Mars began to contact her even before she appeared for work at Adchem. In the week prior to the start of her employment, he called her several times at her home, saying that he was in Florida and asking her whether she was excited about starting the job. Within Cush–Crawford's first week on the job, Mars began to tell her that she looked beautiful and that he loved the dresses she wore. He would page her over the intercom, and when she called back he would ask her what she was doing later. Cush–Crawford having disclosed in her interview that she liked to work out at a gym, Mars repeatedly asked her whether she would like to go to the gym with him after work. Cush–Crawford testified that at the beginning she said no, but that Mars did not stop asking. She also testified that Mars began complaining about her work performance, and that she believed that his complaints were tied to her refusals to go out with him. As a result, Cush–Crawford eventually went to the gym with Mars on one or two occasions.

Two or three weeks into her employment at Adchem, Mars asked Cush–Crawford to go to Toronto with him to attend a Caribbean festival. Cush–Crawford testified that initially she refused to go, but that she agreed after a few days because Mars "would remind [her]" of the "weekly evaluation" that he controlled as her supervisor. Cush Crawford further testified that Mars's behavior toward her changed and that his evaluations of her work improved after she agreed to go to the festival with him.

Cush–Crawford and Mars drove to Toronto early on a Saturday morning sometime in late July or August of 1993. Cush–Crawford expected to have her own room. Instead, Mars informed her that only one room was available in the bed and breakfast. Cush Crawford testified that after the carnival that night, Mars tried to kiss her and touch her breasts, but that she pulled away, and that Mars did not bother her again during the remainder of the weekend. After returning from Cana-

da, Mars began to comment negatively on Cush–Crawford's work habits.

Approximately one week after the trip to Canada, Mars asked Cush–Crawford to go on a second trip with him, this time a one-day trip to Boston for another carnival. Cush–Crawford testified that although she initially said no, she eventually changed her mind and agreed to go, in fear that if she did not, she would not survive Adchem's three-month probation period. On the drive back from Boston, Mars claimed that he was too tired to drive and pulled off the highway into a motel. He booked one room, and once inside the room told Cush–Crawford that he "wanted to make love." Cush–Crawford testified that when she refused, Mars told her that he had hired her and that he could also fire her. Upon their return to work, Mars once again complained about her work performance.

Around August 24, 1993, Mars and Cush–Crawford went out for Cush–Crawford's birthday. Cush–Crawford testified that she agreed to do so because she did not want to get a bad evaluation. At dinner, Mars again told Cush–Crawford that he "wanted to sleep with [her]," that "he wished he could make love to [her] on her birthday," and that he wanted to go to a hotel with her. Cush–Crawford again refused.

Cush–Crawford testified that she and Mars went out one last time during the winter of 1993–1994. Mars told her that she was up for an evaluation and then asked her to go to dinner with him. Although Cush–Crawford and Mars apparently did not see one another outside work again, Mars continued to ask her out into early 1994, even after she told him that she was "fed up" with him. Cush–Crawford further testified that Mars sent her a number of greeting cards in the mail and that he made comments as late as Febru-

ary 1994 to the effect that she looked "good" or "sexy." Finally, in August 1994, he asked her to accompany him on a company trip to the Riverhead plant and to stay overnight at a hotel with him. She refused.

Cush–Crawford testified that she reported Mars's advances to Adchem supervisors beginning in September 1993, telling a production control supervisor that "Mars was coming on to [her] and he was calling [her] and he kept asking [her] out and [that] if [she] didn't go out with him he would get upset, and if [she] didn't return his pages he would be upset with [her] the next day." Cush–Crawford also testified that in that same month, she told Adchem's vice president about the situation, and that the vice president told her that he was "aware of the situation." Cush–Crawford testified further that she told the vice president about similar matters on July 14, 1994, and in November 1994.

In the November 1994 meeting, Cush–Crawford testified that she used the words "sexual harassment" for the first time. Adchem then reassigned her to its Riverhead facility and suspended Mars. After Cush–Crawford grew dissatisfied with working at the Riverhead plant, she returned to the Westbury facility, where she was again put under the supervision of Mars, though this time separated by an intermediate layer of supervision. A few months later, Cush–Crawford suffered an unrelated on-the-job injury and did not return to Adchem.

On April 21, 1995, Cush–Crawford filed a complaint alleging unlawful discrimination with the New York State Commission on Human Rights. The EEOC issued a right-to-sue letter on November 8, 1997. On January 30, 1998, Cush–Crawford filed this action in the United States District Court for the Eastern District of New York. The complaint alleged, in relevant

part, hostile environment sex harassment and quid pro quo sex harassment, as well as retaliation for lodging a sex harassment complaint, in violation of Title VII.

Defendant's principal contention was that the relationship was consensual and non-harassing and that Cush–Crawford had not reported her complaints about Mars to company officials prior to November 1994. A company official testified that when Cush Crawford made a complaint in September 1993, it related to an incident involving a coworker, and included no mention of sexual advances by Mars. According to the defendant, Cush–Crawford's complaints were always in connection with other issues, and mentioned Mars only in passing. Finally, defendant contended that when Cush–Crawford finally brought her complaint about Mars to its attention in November 1994, company officials took prompt remedial action.

After a six-day jury trial before Judge Spatt, the jury returned a verdict in favor of Adchem on the quid pro quo and retaliation claims, and in favor of Cush–Crawford on the hostile environment claim. The jury awarded Cush–Crawford zero dollars in actual damages and $100,000 in punitive damages. Plaintiff moved for a new trial on the issue of compensatory damages and for an award of attorney's fees; defendant moved to set aside the jury's verdict on the hostile environment claim and to set aside the award of punitive damages. The trial judge denied defendant's motion to set aside the verdict and the punitive damages award, and denied plaintiff's motion for a new trial on the issue of actual damages. The trial judge then awarded plaintiff $54,052 in attorney's fees and $2,026 in costs. Adchem appealed and Cush–Crawford cross-appealed.

## DISCUSSION

On appeal, Adchem and Cush–Crawford raise a number of different arguments.

Adchem contends: (1) Cush–Crawford's Title VII claims were time-barred; (2) the evidence was insufficient to support the jury's verdict on the question of hostile work environment; (3) the trial judge improperly failed to instruct the jury on Adchem's affirmative defense to vicarious liability for sex harassment; and (4) punitive damages are unavailable absent an award of actual or nominal damages. Cush–Crawford, in turn, argues that she is entitled to a new trial on the issue of actual damages for pain and suffering. We find no reversible error, and write only to clarify the availability of punitive damages under Title VII absent an award of actual or nominal damages.

Title VII provides that a plaintiff may recover punitive damages where the plaintiff demonstrates that the defendant "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In order to establish malice or reckless indifference, a plaintiff need not show that the defendant committed egregious or outrageous acts. Rather, a plaintiff need only demonstrate that the defendant had the "requisite state of mind" of malice or reckless indifference. *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 538, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); *see also Luciano v. Olsten Corp.,* 110 F.3d 210, 219–20 (2d Cir.1997). Specifically, a plaintiff seeking to establish this must demonstrate that the "employer . . . at least discriminate[d] in the face of a perceived risk that its actions will violate federal law." *Kolstad,* 527 U.S. at 536, 119 S.Ct. 2118.

The amount of punitive damages is subject to a schedule that places caps on the "sum of the amount of compensatory

damages awarded under this section for future pecuniary losses, emotional pain, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section." 42 U.S.C. § 1981a(b)(3). In the case of an employer with more than 100 and fewer than 201 employees, the maximum award of future pecuniary, nonpecuniary, and punitive damages is $100,000. See 42 U.S.C. § 1981a(b)(3)(B).[1]

■ This Circuit has not yet decided whether a plaintiff may receive punitive damages in Title VII cases where plaintiff has been awarded neither actual damages nor nominal damages. Uncertainty as to the availability of punitive damages was apparent in the district court's treatment of the issue. Judge Spatt instructed the jury that punitive damages "may be allowed only if you should first unanimously award the plaintiff a verdict for actual damages." The jury, however, returned a verdict awarding plaintiff zero actual compensatory damages and $100,000 in punitive damages. Judge Spatt then reversed his position and denied defendant's post-trial motion to set aside the punitive damage award, holding that an award of no actual or nominal damages does not preclude a punitive damages award.

In our view, Judge Spatt's second approach was correct. An award of actual or nominal damages is not a prerequisite for an award of punitive damages in Title VII cases.

The plain language of the statute does not expressly state whether punitive damages are available absent an award of actual damages, and the Courts of Appeals

that have considered the question have reached different results. The Seventh Circuit holds that punitive damages may be awarded in a Title VII case absent an award of actual or compensatory damages. See Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008, 1010–11 (7th Cir.1998) (Easterbrook, J.) (affirming jury award of punitive damages without actual damages and apparently without nominal damages). And, under an analogous provision of the Fair Housing Act, the Third Circuit has held that punitive damages are available absent awards of actual or nominal damages. See Alexander v. Riga, 208 F.3d 419, 430–34 (3d Cir.2000), cert. denied, 531 U.S. 1069, 121 S.Ct. 757, 148 L.Ed.2d 660 (2001). By contrast, under the First Circuit's rule, "punitive damages award must be vacated absent either a compensatory damages award, or a timely request for nominal damages." Kerr–Selgas v. Am. Airlines, Inc., 69 F.3d 1205, 1215 (1st Cir. 1995). Similarly, on the question of punitive damages under the Fair Housing Act, the Fourth and Fifth Circuits have held that punitive damages are not available absent a compensatory damages award. See Louisiana ACORN Fair Hous. v. LeBlanc, 211 F.3d 298, 303 (5th Cir.2000) (recognizing that punitive damages are not available in absence of actual damages unless there has been a constitutional violation), cert. denied, —— U.S. ——, 121 S.Ct. 1225, 149 L.Ed.2d 136 (2001); People Helpers Found., Inc. v. City of Richmond, 12 F.3d 1321, 1327 (4th Cir.1993).

In defendant's view, we should adopt the First Circuit's approach and apply what defendant describes as the traditional common law rule that precludes punitive dam-

---

1. For defendants with more than fourteen and fewer than 101 employees, the statute caps the aggregate at $50,000; for defendants with more than 100 and fewer than 201 employees (like Adchem), at $100,000; for defen-

dants with more than 200 and fewer than 501 employees, at $200,000; and for defendants with more than 500 employees, at $300,000. See 42 U.S.C. § 1981a(b)(3)(A) through (D).

ages absent an award of actual or nominal damages. There is, however, no one common law rule. Some courts hold in common law cases that punitive damages may be awarded only where actual compensatory damages are also awarded. *See, e.g., Morsey v. Chevron, USA, Inc.,* 94 F.3d 1470, 1477 (10th Cir.1996) (Kansas law); *Brown v. Petrolite Corp.,* 965 F.2d 38, 48–49 (5th Cir.1992) (Texas law); *Wolff v. Berkley Inc.,* 938 F.2d 100, 102–03 (8th Cir.1991) (Iowa law); *SK Hand Tool Corp. v. Dresser Indus., Inc.,* 284 Ill.App.3d 417, 219 Ill.Dec. 833, 672 N.E.2d 341, 349–50 (1996). A variant position holds that punitive damages may be awarded without an award of compensatory damages, so long as the plaintiff submitted evidence of actual damages. *See, e.g., Rogers v. Loether,* 467 F.2d 1110 (7th Cir.1972), *aff'd sub nom. Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). The requirement of actual damages has been described by commentators as the majority rule, *see Prosser & Keeton on the Law of Torts* § 2, at 14 (5th ed.1984), but it has also been sharply criticized, *see id; see also Restatement (Second) of Torts* § 908 cmt. (c) (1979) ("[I]t is not essential to the recovery of punitive damages that the plaintiff should have suffered any harm, either pecuniary or physical."). On the opposite side, some other courts have held that an award of nominal damages is sufficient to support punitive damages, *see, e.g., Action House, Inc. v. Koolik,* 54 F.3d 1009, 1013–14 (2d Cir.1995) (New York law); *Ins. Servs. of Beaufort, Inc. v. Aetna Cas. and Sur. Co.,* 966 F.2d 847, 853 (4th Cir. 1992) (South Carolina law); *Am. Bus. Interiors, Inc. v. Haworth, Inc.,* 798 F.2d 1135, 1146–47 (8th Cir.1986) (Missouri law); *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 477 A.2d 1224, 1231–32 (1984), though there has been disagreement in this line of cases over whether nominal damages qualify when they are awarded for a technical violation of a legal duty that causes no harm to the plaintiff, as opposed to where nominal damages are awarded because it is impossible to give the harm a dollar value, *compare Shell Oil Co. v. Parker,* 265 Md. 631, 291 A.2d 64, 71–72 (1972) (distinguishing nominal technical damages from nominal compensatory damages that are awarded because of measurement difficulties, and holding that only the latter supports an award of punitive damages), *with Underwriters' Labs., Inc. v. Smith,* 41 Misc.2d 756, 246 N.Y.S.2d 436, 437 (Kings Cty. Sup.Ct.1964) (nominal damages support punitive damages even where plaintiff could show no harm from trademark violation).

Still other courts have held that punitive damages may be awarded so long as liability has been established and justification is shown for a punitive award, regardless whether there has been an award of either actual or nominal damages. *See, e.g., Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.,* 943 F.2d 1511, 1520 (11th Cir.1991) (Florida law); *Ault v. Lohr,* 538 So.2d 454, 456 (Fla.1989); *Rosenberg v. Lee's Carpet & Furniture Warehouse Outlet, Inc.,* 80 Misc.2d 479, 363 N.Y.S.2d 231, 233–35 (County Sup.Ct. 1974). In cases brought under Section 1983, we have adopted the latter approach, holding that punitive damages are available regardless whether other damages have been awarded. *See King v. Macri,* 993 F.2d 294, 298 (2d Cir.1993); *see also Robinson v. Cattaraugus County,* 147 F.3d 153, 161 (2d Cir.1998).

Those courts that have required actual damages as a precondition for a punitive award have worried that allowing punitive awards where the wrongs are insubstantial would "open[ ] too wide the door for unreasonable verdicts by juries" given the absence of any definite "limitation upon the amount of the verdict which may be

found." *Flanagan v. Womack,* 54 Tex. 45, 1880 WL 9362, at *2 (1880); *see also King,* 993 F.2d at 298 (noting concerns about the grant of punitive damages in cases that are "too insubstantial to support any compensatory awards"). In Title VII cases, however, the statutory maxima capping punitive damage awards strongly undermine the concerns that underlie the reluctance to award punitive damages without proof of actual harm. As noted above, 42 U .S.C. § 1981a(b)(3) provides that punitive damages cannot exceed $50,000, $100,000, $200,000, or $300,000, depending on the size of the defendant company. To the extent that courts worried about unleashing juries to award limitless punitive damages in cases where no harm had occurred, this concern is eliminated by the imposition of the statutory caps.

Furthermore, the objectives of punitive damages by definition differ from the objectives of compensatory damages. There is some unseemliness for a defendant who engages in malicious or reckless violations of legal duty to escape either the punitive or deterrent goal of punitive damages merely because either good fortune or a plaintiff's unusual strength or resilience protected the plaintiff from suffering harm. It is often "precisely [in the cases where no actual harm is shown] that the policy of providing an incentive for plaintiffs to bring petty outrages into court comes into play." *Prosser & Keeton on Torts* § 2, at 14; *see also Restatement (Second) of Torts* § 908 cmt. (c).

As for nominal damages, they are generally no more than symbolic. The need for such a symbol of opprobrium in the absence of compensatory damages disappears where the factfinder has signified its opprobrium by making an express award of punitive damages. And to make enforcement of the jury's award of punitive damages turn on whether the jury also awarded purely symbolic nominal damages carries a likelihood of defeating the jury's intention as the result of confusion.

In conclusion, in Title VII cases, we see no reason to make award of actual or nominal damages a prerequisite to the award of punitive damages. We hold that in Title VII cases, where the factfinder has found in a plaintiff's favor that the defendant engaged in the prohibited discrimination, punitive damages may be awarded within the limits of the statutory caps if the defendant has been shown to have acted with a state of mind that makes punitive damages appropriate, regardless whether the plaintiff also receives an award of compensatory or nominal damages.

■ Moreover, we are satisfied that the evidence presented at trial was sufficient to support the jury's punitive damages award. Plaintiff testified not just that she was the victim of persistent egregious sexual harassment by a supervisor, but also that she notified company officials about the harassment as early as September 1993—just two months into her employment and over one year before Adchem took any remedial action. Adchem's theory of the case, to be sure, was that plaintiff did not effectively notify company officials of the sexual harassment until November 1994, and that the earlier complaints had really only been complaints about other problems that were only tangentially related to plaintiff's relationship with Collin Mars. Nonetheless, the jury could rationally have credited plaintiff's version that, in spite of her complaints to company officials, the company did nothing to protect her from the abuse for many months.

■ Having upheld the jury's award of $100,000 in punitive damages, we need not address plaintiff's argument that she is entitled to a new trial on the issue of compensatory nonpecuniary damages for

pain and suffering. The statutory damages caps in Title VII cases preclude federal courts from awarding damages in excess of $100,000 (in cases of employers with more than 100 and fewer than 201 employees) for the aggregate of future pecuniary losses, nonpecuniary losses, and punitive damages. *See* 42 U.S.C. § 1981a(b)(3). Because plaintiff's alleged pain and suffering is subject to this statutory cap, and because she has already been awarded the full amount available to her under the cap, she can receive no further damages for her alleged pain and suffering. The issue is therefore moot.

## CONCLUSION

Finding no reversible error below, we affirm the judgment of the district court.