IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 2, 2008

Charles R. Fulbruge III
Clerk

No. 06-30476

ELGIE ABNER, ET AL.

Plaintiffs-Appellees

v.

THE KANSAS CITY SOUTHERN RAILROAD CO.

Defendant-Appellant

Appeals from the United States District Court for the
Western District of Louisiana, Shreveport Division

Before HIGGINBOTHAM, WIENER, and GARZA, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge.

I

Eight African American employees of Kansas City Southern Railway Company (KCSR, or KCS) sued the company in district court for creating an environment hostile to race. A jury found the company liable and awarded no compensatory damages, but awarded each plaintiff $125,000 in punitive damages. The district court entered judgment on the verdict, adding $1 in nominal damages. KCSR timely appealed.

II

This is a discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981. Eight Plaintiffs, employees of KCSR, alleged that KCSR subjected them to a hostile work environment. Plaintiffs alleged that they encountered repeated instances of racially derogatory acts in KCSR's diesel shop in Shreveport, Louisiana, including, inter alia, a wire hanging near the workshop that allegedly had been bent to form the shape of a noose; racial graffiti on the workshop walls; racially derogatory comments and threats, both spoken and written; and transfers to unwanted night and weekend shifts when employees objected to these comments and to other racially motivated activity.

A first trial ended in a mistrial when the jury failed to reach a verdict. At the second trial, a jury found that Defendant had created a hostile work environment and failed to show by a preponderance of the evidence that it had corrected the racially derogatory behavior. It awarded no compensatory damages but awarded $125,000 in punitive damages to each Plaintiff. The district court's judgment incorporated the jury award and additionally awarded each Plaintiff $1 in nominal damages. The court denied Defendant's Motion for Judgment as a Matter of Law and Alternative Motion for New Trial.

### III

We are urged to upset the judgment entered upon the jury verdict of punitive damages awarded under Title VII and § 1981 because there was no award of compensatory damages. We will turn to this contention, but there is a potentially dispositive and hence antecedent question – whether there was a constitutional violation – in which case a sole award of punitive damages is permissible.[1] If there was no constitutional violation the question becomes more

---

[1] La. ACORN Fair Housing v. LeBlanc, 211 F.3d 298, 303 (5th Cir. 2000) (affirming that "our circuit has adhered to the general rule that a punitive award may stand in the absence of actual damages where there has been a constitutional violation").

difficult. If we conclude that the punitive damages need not be accompanied by an award of compensatory damages, we must determine whether the amount awarded denies KCSR the due process secured by the Fourteenth Amendment.

"We review the district court's ruling on a motion for judgment as a matter of law de novo"[2] and a denial of a motion for new trial for an abuse of discretion.[3]

IV

The jury was asked, "Do you find by a preponderance of evidence that [Plaintiff] was subjected to a hostile working environment as defined in instruction number 7?" The jury answered "yes" for each Plaintiff. The jury answered "no" to the question, "Do you find by a preponderance of evidence that KCS exercised reasonable care to prevent and promptly correct any racially harassing behavior?" The court instructed the jury, in relevant part:

> It is unlawful for an employer to discriminate against an employee because of the employee's race. Racial discrimination includes harassment based upon race. In order for KCS to be found liable, the conduct complained of must have been sufficiently severe or pervasive to alter the terms or conditions of that plaintiff's employment and to have created a hostile or abusive work environment. . . . A hostile work environment claim may consist of a series of separate acts that collectively constitute one unlawful employment practice.

The court did not instruct the jury to address whether a constitutional violation occurred.

The Supreme Court has held that "Congress has been given the unique constitutional power of legislating to enforce the provisions of the Thirteenth, Fourteenth, and Fifteenth Amendments"[4] and that "Congress' enactment of 42

---

[2] Lincoln v. Case, 340 F.3d 283, 289-90 (5th Cir. 2003).

[3] Id. at 290.

[4] Fullilove v. Klutznick, 448 U.S. 448, 500 (1980).

U.S.C. § 1981 pursuant to its powers under the Thirteenth Amendment . . . provides to all persons a federal remedy for racial discrimination in private employment."[5]   This power arises because "Section 2 of the Thirteenth Amendment, which abolished slavery, provides that 'Congress shall have power to enforce this article by appropriate legislation.'"[6]  Furthermore, we have found that Title VII legislation is "supportable . . . under the enabling clause of the thirteenth amendment to the same extent that, as the first Justice Harlan said, the Civil Rights Act of 1866 is supported by the thirteenth amendment."[7]

A constitutional grant of power to Congress in enacting a statute does not require that a statute directly incorporate a constitutional principle.  We have distinguished between constitutional and statutory claims in cases where plaintiffs bring their claims under § 1981 and the Thirteenth Amendment.[8] Similarly, the Eleventh Circuit has specifically defined some Title VII claims as involving "a violation of purely statutory rights,"[9] and the Supreme Court has found that a plaintiff bringing a Title VII claim without an accompanying claim under the Constitution "does not advance a constitutional claim."[10]  Although § 1981 and Title VII more generally arise from the powers granted to Congress by

---

[5] Id. (citations omitted).

[6] Id. at 500 n.2; see also Tillman v. Wheaton-Haven Recreation Ass'n, Inc., 410 U.S. 431, 439 & n.11 (1973) ("The operative language of both § 1981 and § 1982 is traceable to the Act of April 9, 1866, c. 31, § 1, 14 Stat. 27 [which 'rested only on the Thirteenth Amendment']. . . . The present codification of § 1981 is derived from Revised Statutes § 1977 (1874), which codified the Act of May 31, 1870, § 16, 16 Stat. 144.").

[7] Williams v. City of New Orleans, 729 F.2d 1554, 1577 (5th Cir. 1984).

[8] See, e.g., Grigsby v. North Mississippi Med. Ctr., Inc., 586 F.2d 457, 459 (5th Cir. 1978) (plaintiff brought claims under §§ 1981, 1983, Title VII, and the Thirteenth Amendment).

[9] Walker v. Anderson Elec. Connectors, 944 F.2d 841, 845 (11th Cir. 1991).

[10] Johnson v. Transp. Agency, 480 U.S. 616, 664 (1987); but see id. at 664-65 (finding that "Title VI embodies constitutional restraints on discrimination" and that "[t]here is no good reason to think that Title VII, in this regard, is any different from Title VI").

4

the Thirteenth Amendment and embody its principles, the jury finding pursuant to these statutes and its instructions do not sum to a finding of a constitutional wrong. So we must decide whether the punitive damages award coupled with the district judge's grant of $1 in nominal damages can stand alone.

LeBlanc observed that "[a]lthough the goal of a federal common law of damages is to produce uniform results, so far the federal judiciary has not succeeded in this endeavor."[11] We further recognized our own mixed case law on the issue but attempted to add clarity by concluding that generally, we only allow independent awards of punitive damages upon a finding of a constitutional violation by a defendant.[12] Here, however, we recognize another class of cases not fully addressed in LeBlanc[13] – those involving statutes with caps on punitive damages.[14]

We have upheld jury awards of punitive damages without a finding of a constitutional violation or accompanying compensatory damages, while skirting the underlying constitutional question of whether such awards are permissible. In Lewis v. Parish of Terrebonne,[15] we affirmed a jury verdict for "punitive damages of $6,279 (funeral costs)" without compensatory damages but remanded the case for the district court to make a finding regarding compensatory

---

[11] 211 F.3d at 303.

[12] Id. at 304.

[13] In LeBlanc we briefly discussed punitive damages under § 1981a but did not discuss the cap. Id. at 303.

[14] Indeed, in LeBlanc we recognized that Congress had removed the $1,000 cap on punitive damages under the FHA because Congress had found that the limitation "'served as a major impediment to imposing an effective deterrent on violators and a disincentive for private persons to bring suits under existing law.'" Id. at 301 (quoting H.R. Rep. No. 711 (1988)).

[15] 894 F.2d 142 (5th Cir. 1990).

damages.[16] Similarly, in Dunn v. Denk,[17] an excessive force case, we permitted a jury award of punitive damages accompanied by a district court's award of $1 in nominal damages but also granted a partial new trial, wherein compensatory damages would potentially be awarded.[18] In E.E.O.C. v. E.I. Du Pont de Nemours & Co.,[19] we addressed the "first impression" issue of whether punitive damages awarded without compensatory damages under 42 U.S.C. § 1981a were permissible and concluded that they were.[20] In that case, however, we affirmed a jury award of backpay damages in addition to punitive damages.[21] For Title VII cases not involving backpay, frontpay, or compensatory damages, our district courts have upheld lone punitive damages awards, accompanied by court-assigned nominal damages of $1. These courts have relied on our LeBlanc case's finding that "'there is no established federal common law rule that precludes the award of punitive damages in the absence of an award of compensatory damages . . . '"[22] and on the holding in Carey v. Piphus[23] that under § 1983, even absent

---

[16] Id. at 148-49. We found that "[w]e need not determine whether any legal impediment exists for an award of punitive damages where no award was made for compensatory damage because, as we shall discuss in the following paragraphs, on remand a compensatory damage award will be considered." Id. at 149.

[17] 54 F.3d 248 (5th Cir. 1995).

[18] Id. at 251 ("Denk further challenges the award of punitive damages [without compensatory damages]. We find ample support in the record for such an award. We do not reach the procedural and legal objections because of our decision to order a partial new trial.") (reversed on rehearing on other grounds, Dunn v. Denk, 79 F.3d 401 (1996)).

[19] 480 F.3d 724 (5th Cir. 2007) (hereafter "E.I. Du Pont").

[20] Id. at 733-34.

[21] Id. at 734.

[22] Jimenez v. Paw-Paw's Camper City, Inc., 2002 U.S. Dist. LEXIS 3248 at 40 (E.D. La. 2002) (quoting LeBlanc, 211 F.3d at 301).

[23] 435 U.S. 247 (1978).

a showing of actual injury a plaintiff may receive nominal damages, awarded by the judge, "not to exceed one dollar."[24]

Other circuits have explicitly upheld punitive damages awards without an accompanying award of compensatory damages or backpay in Title VII cases.[25] In so doing, these circuits have found that "[i]n Title VII cases . . . the statutory maxima capping punitive damage awards strongly undermine the concerns that underlie the reluctance to award punitive damages without proof of actual harm."[26] Additionally, our sister circuits have relied on a textual reading of Title VII, finding that "nothing in the plain language of § 1981a conditions an award of punitive damages on an underlying award of compensatory damages. . . . Extra-statutory requirements for recovery should not be invented."[27] Furthermore, the First and Third Circuits, similar to the Supreme Court's decision in Carey, have "approved the award of nominal damages under § 1983 where deprivations of constitutional rights are not shown to have caused actual injury."[28] Although in LeBlanc we have, unlike other circuits, expressly disallowed an award of punitive damages without accompanying compensatory damages,[29] we have since emphasized that our determination in LeBlanc was

---

[24] Id. at 267.

[25] See, e.g., E.I. Du Pont, 480 F.3d at 733 n.6 ("Although we need not and do not decide or endorse their position, two courts of appeals have even upheld punitive damage awards in the absence of either compensatory damages or backpay." (citing Cush-Crawford v. Adchem Corp., 271 F.3d 352, 359 (2d Cir. 2001))); Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008, 1010 (7th Cir. 1998).

[26] Cush-Crawford, 271 F.3d at 359.

[27] Timm, 137 F.3d at 1010 (quotations and citations omitted).

[28] Carey, 435 U.S. at 266 n.24 (citing Thompson v. Burke, 556 F.2d 231, 240 (3d Cir. 1977); United States ex rel. Tyrrell v. Speaker, 535 F.2d 823, 829-30 (3d Cir. 1976); Magnett v. Pelletier, 488 F.2d 33, 35 (1st Cir. 1973); Basista v. Weir, 340 F.2d 74 (3d Cir. 1965)).

[29] 211 F.3d at 301.

limited to the context of damages awarded under the Fair Housing Act;[30] we have also emphasized that our holding in LeBlanc does not cover "all civil rights cases in this circuit."[31] At least one other circuit, however, has denied jury awards of punitive damages without accompanying compensatory or nominal damages under Title VII and § 1981.[32]

We agree with the conclusion of several of our sister circuits that a punitive damages award under Title VII and § 1981 need not be accompanied by compensatory damages. We base our holding on the language of the statute, its provision of a cap, and the purpose of punitive damages under Title VII.

Unlike the Fair Housing Act, which as a matter of the federal common law we have read to require that actual damages accompany an award of punitive damages,[33] Title VII specifically provides for punitive damages and for a cap on these damages. 42 U.S.C. § 1981a(a) states, "In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 . . . against a respondent who engaged in unlawful intentional discrimination . . . prohibited under section 703, 704, or 717 of the Act . . . the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964 . . . from the respondent," while § 1981a(b) provides

---

[30] See, e.g., E.I. Du Pont, 480 F.3d at 734 ("Although LeBlanc surveyed the landscape concerning punitive damages under various statutes and around the circuits, the case ultimately ruled on their availability (a) under the Fair Housing Act and (b) in a case where no compensatory damages of any sort were awarded.").

[31] Id.

[32] See Kerr-Selgas v. American Airlines, 69 F.3d 1205, 1215 (1st Cir. 1995) (holding that a finding of liability in a § 1981 case does not indicate that the plaintiff is "'automatically entitled'" to a nominal damages award in addition to punitive damages and vacating a punitive damages award in the absence of compensatory damages or a "timely request for nominal damages").

[33] LeBlanc, 211 F.3d at 303.

> A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual . . . The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party [$50,000 - $300,000, depending on the number of employees that work for respondent].

That Congress anticipated the award of punitive damages under Title VII, as it clearly did, does not alone answer the question of how much of the federal common law of punitive damages came into the statutory analysis – specifically, whether Congress anticipated whether an award must be accompanied by actual damages.

Title VII's plain language points to Congressional acceptance of independent awards of punitive damages in Title VII actions. It contains a clause ("Determination of punitive damages") providing, "A complaining party may recover punitive damages under this section against a respondent" if that party proves certain conditions – namely discrimination with "malice or with reckless indifference" to federal rights.[34] "[N]othing in the text of the statute limits an award of punitive damages to cases in which the plaintiff also receives compensatory damages."[35] 42 U.S.C. § 1981a(c) states, "If a complaining party seeks compensatory or punitive damages under this section–(1) any party may

---

[34] 42 U.S.C. § 1981a(b)(1).

[35] E.I. Du Pont, 480 F.3d at 733.

demand a trial by jury; and (2) the court shall not inform the jury of the limitations described in subsection (b)(3)."[36]

Legislative history provides additional guidance but does not clarify congressional purpose regarding the necessity of compensatory damages attending punitive damages. It shows that Congress intended to increase the remedies available to complainants in Title VII cases in its effort to prevent discrimination in the workplace. Senate bill 1745,[37] enacted as the Civil Rights Act of 1991, was enacted, inter alia, to "amend the Civil Rights Act of 1964 to strengthen and improve Federal civil rights laws [and] to provide for damages in cases of intentional employment discrimination . . . ." Congress found that "additional remedies under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace" and that a recent Supreme Court decision had weakened the strength of the 1964 Act, thus requiring legislation "to provide additional protections against unlawful discrimination in employment."[38] In Senate floor debate over the bill, Senator Kennedy argued,

> The act provides meaningful remedies, granting victims of intentional sex and religious discrimination the right to recover compensatory damages, and, in particularly [sic], flagrant cases, punitive damages as well. This is the same remedy already available under section 1981 of the Civil Rights Act of 1866 to victims of intentional racial discrimination.[39]

---

[36] Emphasis added; but see 42 USCS § 1981a (b)(3) (stating that "the sum of the amount of compensatory damages . . . and the amount of punitive damages" shall not exceed a given amount (emphasis added)). It does not follow, however, that Congress determined that compensatory damages could not be zero.

[37] 102d Congress, 1st Session (1991).

[38] Id.

[39] 136 CONG. REC. S 9809, S 9810 (July 17, 1990).

Perhaps by the "as well" language Senator Kennedy anticipated that punitive damages were only to be awarded in addition to compensatory damages. Perhaps he contemplated that punitive damages are available as an alternative to compensatory damages in the most egregious of cases. But "perhaps" offers little assistance when we must choose one.[40]

In sum, the text of Title VII, as amended in 1991, and its history demonstrate that Congress did not require actual damages to accompany punitive damages in Title VII actions. But the text does not show whether Congress anticipated that punitive damages would be awarded independently. Unable to glean further guidance on this issue from the statutory language, we look to the common law.

As we have explained, disallowing independent awards of punitive damages responds to concern that jury consideration of punitive damages ought not to be unbounded nor lack of measured proportion to the injury. Unbounded

---

[40] Other legislative history offers little further guidance. See 137 CONG. REC. E3939-01, E-3939 (Nov. 7, 1991) (statement of Rep. Doolittle) ("Employers who are found guilty can expect to pay for pain and suffering and punitive as well as pecuniary damages of up to $300,000, depending upon the number of workers employed."); 137 CONG. REC. S 15472, S 15473 (Oct. 30, 1991) (statement of Sen. Dole) ("It sets an important precedent in tort reform by setting caps on those damages, including pecuniary losses that have not yet occurred as of the time the charge is filed . . . . Punitive damages are also capped, and are to be awarded only in extraordinarily egregious cases."); 137 CONG. REC. S 15348, S 15383 (Oct. 29, 1991) (statement of Sen. Jeffords) ("As recent days have shown, no issue has become more politicized than the inclusion of compensatory and punitive damages in the civil rights bill. When first proposed in the 1990 bill, the creation of tort-like damages under title VII was viewed as a long shot at best, and at worst as trade bait. Title VII has always provided only make-whole relief such as lost wages and benefits or reinstatement to the job. The prospect of expanding beyond that level of damages to include such things as pain, suffering, or humiliation was not viewed by many as being a realistic possibility. However . . . such damages are now a central part of every civil rights proposal . . . . In one form or another, this is an idea whose time has come. In fact, the only remaining questions appear to be whether such damages will be unlimited as to amount or capped and, to a lesser extent, whether they will be awarded by judges or juries.").

awards ill serve the statute's deterrent purpose.[41] Yet, a measure of discretion is essential to this tailoring. Indeed, the federal common law recognizes the importance of jury discretion to award punitive damages.[42] The tension is that "jury discretion – or unlimited judicial discretion for that matter – in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities."[43] With similar concern, when looking to state tort law we have found, for example,

> Texas courts will overturn an award of damages that is so excessive as to be manifestly unjust. To prevent an excessive award of punitive damages, Texas courts require punitive damages to be reasonably proportioned to actual damages. This proportionality requirement is simply a tool to help Texas courts determine when an exemplary damage award is the product of the jury's passion rather than its reason.[44]

Here the statute offers assistance. Congress has set a cap on the sum of compensatory and punitive damages. That cap cabins discretion in the amount of the award in the most direct manner possible – it caps the award. The claims under Title VII and § 1981 here are virtually the same. While the verdict forms did not disclose which statute formed the basis of the jury's finding of liability,

---

[41] See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417 (2003) (quoting Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 42 (O'Connor, J., dissenting)) ("Punitive damages are a powerful weapon. Imposed wisely and with restraint, they have the potential to advance legitimate state interests. Imposed indiscriminately, however, they have a devastating potential for harm.").

[42] See, e.g., Missouri Pac. R. Co. v. Humes, 115 U.S. 512, 521 (1885) ("The discretion of the jury in such cases [involving additional damages] is not controlled by any very definite rules; yet the wisdom of allowing such additional damages to be given is attested by the long continuance of the practice."); LeBlanc, 211 F.3d at 301 (quoting People Helpers Found., Inc. v. Richmond, 12 F.3d 1321, 1326 (4th Cir. 1993)) ("'there is no established federal common law rule that precludes the award of punitive damages in the absence of an award of compensatory damages'"); but see id. at 301, 303 (finding that "we must apply the federal common law" to determine whether compensatory damages must accompany a punitive damages award under the Fair Housing Act, and concluding that they must).

[43] Haslip, 499 U.S. at 18.

[44] Glasscock v. Armstrong Cork Co., 946 F.2d 1085, 1095 (5th Cir. 1991).

the district court instructed the jury regarding punitive damages pursuant to the language of Title VII. The instruction allowed the jury to "award punitive damages, if that plaintiff has proved that KCS acted with malice or willfulness or with callous and reckless indifference to the rights of the plaintiffs to be free from discrimination based upon race." This closely tracks § 1981a's requirement that the complaining party "demonstrate[] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."[45] The court also properly instructed the jury regarding "agency principles" required for a finding of vicarious punitive damages under Title VII,[46] stating, "KSC is only liable for punitive damages in this case if the acts of harassment were committed by a supervisory employee with immediate, or successively higher authority over the plaintiff, and that conduct was contrary to KCS's good faith effort to comply with the law."

The grounding of punitive damages between the high threshold of culpability for an award and a cap of the amount in any event upholds Congress's purpose in enacting the 1991 amendments to Title VII – to provide "additional remedies," in the form of damages, to prevent discrimination in the workplace while mitigating the risk of disproportionate awards.[47] Injury that results from discrimination under Title VII is often difficult to quantify in physical terms; preventing juries from awarding punitive damages when an employer engaged in reprehensible discrimination without inflicting easily quantifiable physical and monetary harm would quell the deterrence that

---

[45] 42 U.S.C.S. § 1981a(b).

[46] Kolstad v. ADA, 527 U.S. 526, 541-42 (1999) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)) ("'in express terms, Congress has directed federal courts to Title VII based on agency principles' . . . . Observing the limits on liability that these principles impose is especially important when interpreting the 1991 Act").

[47] An Act to Amend the Civil Rights Act of 1964, S. 1745, 102d Cong. (1991).

Congress intended in the most egregious discrimination cases under Title VII. Indeed,

> there is some unseemliness for a defendant who engages in malicious or reckless violations of legal duty to escape either the punitive or deterrent goal of punitive damages merely because either good fortune or a plaintiff's unusual strength or resilience protected the plaintiff from suffering harm.[48]

KCSR argues that the jury's award of punitive damages violates due process and fails to withstand the Supreme Court's test in BMW of North America v. Gore[49] for determining the constitutionality of punitive damages awards. KCSR, in its Renewed Motion for Judgment as a Matter of Law and Alternative Motion for a New Trial, similarly argued that "the punitive damage award is unreasonable, unconstitutional, and grossly excessive . . . ." Because the district court denied this motion, we presume that in so doing, it implicitly found the award to be constitutional, thus requiring us to review de novo the court's decision.[50]

As we see it, the combination of the statutory cap and high threshold of culpability for any award confines the amount of the award to a level tolerated by due process. Given that Congress has effectively set the tolerable proportion, the three-factor Gore analysis is relevant only if the statutory cap itself offends due process. It does not and, as we have found in punitive damages cases with

---

[48] Cush-Crawford, 271 F.3d at 359.

[49] 517 U.S. 559 (1996).

[50] See Cooper Indus. v. Leatherman Tool Group, 532 U.S. 424, 436 (2001) ("courts of appeals should apply a de novo standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards"); see also id. at 435 (finding that "courts of appeals must review the proportionality determination 'de novo' . . . . 'The factual findings made by the district courts in conducting the excessiveness inquiry, of course, must be accepted unless clearly erroneous . . . . But the question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context de novo review of that question is appropriate'" (quoting United States v. Bajakajian, 524 U.S. 321, 336-37 n.10 (1998))).

accompanying nominal damages, a ratio-based inquiry becomes irrelevant.[51] Accepting this analysis makes the sufficiency of evidence to support the statutory threshold a determinant of constitutional validity. We turn to that task.

Here, Plaintiffs, supervisors, and other witnesses testified to incidents of racially discriminatory behavior that occurred within the ten-year time frame of evidence permitted by the court.[52] Elgie Abner testified about picking up a toolbox on which someone had written, "You lazy ni _ _ _ _ s" and that, when he presented the box to a supervisor, the supervisor laughed. He also testified that a cement pillar in the workshop contained a large marking of "KKK" for a number of years, as did the fuel tanks and roofs of many locomotives in the shop, and that in May of 2005, "Abner is a lazy racist" was written on the walls in the bathroom of the workshop." "Ni _ _ _r go home" and "Lazy ni_ _ _ _s" were also written on the walls. Harry Brooks testified that foreman Gary Moore would, on the night shift, wait until a large thunderstorm came and then, laughing, send the workers out in the storm.[53] He also testified that an electrical wire in the form of a noose was hanging outside of the workshop, that there was graffiti in the workshop bathrooms that said, "Ni _ _ _ _ s stink" and "Ni _ _ _ _ s go home," and that supervisors "knew" of the graffiti and the noose. Napoleon

---

[51] Williams v. Kaufman County, 352 F.3d 994, 1016 (5th Cir. 2003) (finding that "any punitive damages-to-compensatory damages "ratio analysis" cannot be applied effectively in cases where only nominal damages have been awarded").

[52] All of the testimony in this section was elicited with questions that limited Plaintiffs to events that occurred from 1995 and onward. Although Plaintiffs did not indicate the exact dates of some of these events, the testimony relates to events that occurred within the permitted ten-year window. Attorney Morgan told Abner, for example, "Now I want to talk for a moment about the existence of racial slurs and derogatory slurs in the yard there. And the time frame that we're under instruction to follow is '95 and after that. So we don't go before that. From '95 up to his time, let's take it up to 2003, describe to the Court and the Jury, what type of racial slurs or epithets did you see written on the walls in that place?"

[53] This occurred "through '96 and forward."

Player testified that a supervisor called him "boy" in 1995 and that Gary Moore referred to him as a "rice-eating Ethiopian" and said that he was going to run two "black a _ _ es off."[54]  In 1995, Moore also allegedly referred to Napoleon Player's shift as the "c_ _n shift."  Napoleon Player also testified that he did not recall receiving any racial harassment training prior to retiring in June of 2003.  Mr. Odom similarly testified that "the first [racial harassment policy] I got was . . . if I'm not mistaken, August 2003." Donald Harville testified that a company surgeon told him, when he arrived late for work in November of 2001, "That's it for you and your ni_ _ _ _ buddies."  This and other evidence supports the jury's conclusion that KCSR supervisors caused and/or failed to properly respond to numerous instances of racially derogatory behavior in the workplace.

Looking to our awards of punitive damages in similar cases involving discrimination is also instructive in this case.  Where punitive damages of $100,000 were awarded in a racial discrimination case under the Fair Housing Act, we reduced the damages to the "statutory maximum penalty" allowed under the Fair Housing Act for a first time offense  – $55,000[55] – looking to a quantity most closely analogous to a "cap" under the FHA.  In an American with Disabilities Act case, where a jury awarded equitable wage loss but no compensatory damages and awarded $1 million in punitive damages, which the district judge reduced to $300,000 pursuant to the Title VII cap, we upheld the $300,000 award.[56]  We similarly refuse to strike down the jury award here, as it fell well below the cap, and there is no indication that it resulted from jury bias or insufficient evidence of malice.

---

[54] He testified as to these incidents after Attorney Moore stated, "So Mr. Player, we are going to move forward to '95 . . . ."

[55] Lincoln v. Case, 340 F.3d 283, 294 (5th Cir. 2003).

[56] E.I. Du Pont, 480 F.3d at 728, 734.

With respect to the district court's award of nominal damages of $1 to each Plaintiff, we find such formalities to be unnecessary. We have required a district court to grant a plaintiff $1 in nominal damages when her constitutional rights were violated.[57] Other circuits, however, have found that a jury verdict of liability under Title VII did not require a court to award a nominal damages award in the absence of a request that the jury determine nominal damages or a request for additur by the judge.[58] Because the award of actual or punitive damages is capped under Title VII, we do not require a ceremonial anchor of nominal damages to tie to a punitive damages award.

We therefore UPHOLD the district court's judgment granting $125,000 in punitive damages to each Plaintiff.

V

Defendant asserts that the district court erred in adopting a "ten-year rule," which permitted the Plaintiffs to testify about incidents contributing to a hostile workplace as far back as ten years. Defendant argues that Plaintiffs failed to establish evidence of a continuing violation, and that the court's allowance of evidence that reached beyond the statutory period violated the rules in National Railroad Passenger Corp. v. Morgan[59] and Celestine v. Petroleos de Venezuela SA.[60] KCSR further asserts that the district court allowed Plaintiffs to testify outside of the permitted ten-year window. Neither the court's imposition of the ten-year period, nor the court's admission of Plaintiffs' testimony outside of the ten-year period, caused prejudicial error.

---

[57] Fyfe v. Curlee, 902 F.2d 401, 406 (5th Cir. 1990).

[58] Kerr-Selgas v. American Airlines, Inc., 69 F.3d 1205, 1215 (1st Cir. 1995).

[59] 536 U.S. 101 (2002).

[60] 266 F.3d 343, 353 (5th Cir. 2001).

A hostile work environment claim necessarily involves "the cumulative [e]ffect of individual acts,"[61] and evidence presented in support of these claims may fall outside of the statutory period. For example, the Supreme Court has found, for hostile work environment claims under 42 U.S.C. § 2000e in the context of timely filing,

> It does not matter, for purposes of the statute [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.[62]

Moreover, the Supreme Court has emphasized that hostile work environment claims "are different in kind from discrete acts. Their very nature involves repeated conduct."[63] "The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years . . . ."[64] Although in Morgan the Court recognized that its findings did not allow admission of discrete time-barred evidence,[65] the Court has also recognized that courts may waive or equitably toll a statute of limitations, as well as other requirements under Title VII.[66]

The district court allowed Plaintiffs to testify within an approximate ten-year window of conduct, finding that Plaintiffs could reach beyond the limitations period to 1995 for "[t]hose acts contributing to the alleged hostile

---

[61] Morgan, 536 U.S. at 115.

[62] Id. at 117 (emphasis added).

[63] Id. at 115.

[64] Id. (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

[65] Id. at 113.

[66] Zipes v. TWA, 455 U.S. 385, 393 (1982).

work environment."[67]   Defendant argues that Plaintiffs failed to follow this limitation because they "did not identify with any specificity the time period in which they allegedly witnessed . . . graffiti" and "testified similarly with regard to having heard racially derogatory language in their workplace and having seen what they believed to be nooses in and around the Diesel Shop . . . Plaintiffs sat back and relied on their general testimony."[68]

The court sustained Defendant's objections when Plaintiffs attempted to present testimony outside of the designated time frame.[69]   Furthermore, the court's allowance of testimony regarding events that occurred at an unspecified time within the ten-year period, and some events that occurred during a specific year within that period, by no means placed the events outside of that time frame.   Nor was any lack of individualized assessment as to each event's relation to the hostile work environment clearly erroneous.   Much of the evidence

---

[67] This finding did not violate Celestine or Morgan, nor did it fail to apply the principles of Celestine and Morgan to determine whether the continuing violation doctrine should apply. Under Celestine, "[T]he burden is upon each of the appellants to offer evidence that they suffered race-base[d] harassment both prior [to] and during the filing period, that the incidents of harassment were related, and that the harassment was pursuant to an organized scheme." 266 F.3d at 352-53 (citing Webb v. Cardiothoracic Surgery Assocs., 139 F.3d 532, 537 (5th Cir. 1998)).   In the memorandum supporting their motion in limine for admission of evidence beyond the statute of limitations period, Plaintiffs alleged "evidence of several incidents within the limitations period since April 29, 1999 including an oil house noose in 2002, a running repair noose in 2003, and the promotion of a convicted klansman to Assistant Superintendent of Locomotives who had used derogatory language according to deposed witnesses."   At trial, each Plaintiff individually testified to having seen what looked like a noose in the workplace. Plaintiffs further alleged in the memorandum that "many acts involve the same supervisor, the same location in the mechanical department, and flow from defendant's failure to have in place written anti-discrimination policies and lack of training for workers and supervisors." In granting Plaintiffs' motion in limine, the court also relied on Morgan's holding that, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability."   536 U.S. at 117.

[68] Defendant's Brief at 43.

[69]   The court stated, for example, in response to an objection by Defendant, "I'm going to sustain the objection.  It's way, way out of date.  Way beyond the limitations given to us in Title VII and in 1981 cases . . . ."

presented from within the ten-year period related directly to the hostile work environment.

Defendant conceded in its brief that Plaintiffs testified as to seeing wires that appeared to be in the shape of nooses during specific years and time periods falling within the ten-year window,[70] as well as graffiti and racially derogatory language that occurred within the window.[71] Even excluding Plaintiffs' testimony that does not relate to specific time periods or that referred to events prior to 1995, Plaintiffs and their witnesses presented sufficient evidence of a hostile work environment that occurred specifically within the time frame

---

[70] Defendant's Brief at 8-12 ("Abner testified that there was a coaxial piece of wire that he believed was in the shape of a noose . . . between the years of 1995 and 2002."; "Brooks saw and was aware of what he believed to be a noose hanging from the oil house . . . since at least 1995."; "Martin testified that, in 2000, he saw what he believed to be a noose hanging from the oil house . . . ."; "Odom testified that he saw what he believed to be a noose made of wire hanging down from the oil house near the Diesel Shop in 2002."; "Walker testified that he was given an assignment sheet from one of his supervisors in 1996 that had what he believed to be a noose drawn on it" (emphasis added)); see also id. at 46-48 (conceding that Plaintiffs testified about noose incidents occurring at specific times within the ten-year window). The testimony on nooses that does not specify a time period within the allowed ten-year frame, or suggests that the event testified to may have occurred outside of the ten-year frame, appears to have been that of L. Player ("L. Player testified that he saw what he believed to be a noose hanging from the oil house . . . in the middle 1980's.") and N. Player ("N. Player testified that he saw what he believed to be noose at the oil house for years."). Id. at 13-14.

[71] Id. at 8-9 ("Abner testified that, in 1996, he discovered an impact wrench box in the tool room that read "you lazy n-----s."; "Abner testified that, sometime between 1995 and 2003, he saw the words '----- go home,' 'lazy n-----s,' and 'Abner is a lazy racist' on a wall in the Diesel Shop."; "Abner testified that supervisor Dan Agler said: 'well, they tell me if you-all have the same tools, they'll end up in the pawn shop.'"; "Abner testified that, in May 2005, the phrase 'Abner is a lazy racist' was written on a wall in the Diesel Shop bathroom."; "Abner testified that, in November 2005, mechanical supervisor Charles Dotson said that foreman Dennis Blankenship stated that the reason he 'didn't like blacks' was because 'the blacks were jumping on policemen, shooting policemen' in 1970 or 1971."; "Between 1993 and 2003, N. Player testified that he heard of the N-word being used one time at KCSR."; N. Player testified that, in 1995, then-Superintendent Fred Haywood called him 'boy.'"; N. Player testified that, in 2001, Moore said he was going to run two people off . . . 'them two lack a—s right there.'") (emphasis added)); see also id. at 46-48 (conceding that Plaintiffs testified about some graffiti and derogatory language incidents that occurred at specific times within the ten-year window). Other Plaintiffs similarly testified to seeing graffiti and hearing derogatory remarks and, although they did not specify the time period, they did not suggest that the incidents occurred outside of the ten-year window.

designated by the district court, and much of this fell within the limitations period.[72]

## VI

Defendant argues that the district court improperly admitted hearsay testimony and missapplied Rule 801(D)(2)(D). We review a district court's evidentiary rulings for an abuse of discretion, and if we find that the court admitted hearsay evidence in error, we ask whether the error was harmless.[73] Even presuming that the district court's admission of hearsay statements was in error, this error was harmless. Defendant asserts that Plaintiffs presented a "substantial amount of hearsay testimony regarding statements allegedly made by non-management employees, simply because those statements concerned the employment relationship or were made in the workplace." However, the record is also replete with testimony about behavior and statements directed at the testifying Plaintiffs by supervising KCSR employees, as well as these employees' failure to redress the racially derogatory behavior of which they were aware.[74]

## VII

Defendant alleges several other evidentiary errors, arguing that the court improperly allowed in evidence of Moore's KKK-related conviction from 1992 and

---

[72] See supra notes 70-71.

[73] Cozzo v. Tangipahoa Parish Council-President Gov't, 279 F.3d 273, 292 (5th Cir. 2002).

[74] N. Player testified that Moore made monkey sounds and gestures, "as if he was indicating I was some kind of gorilla or some type of monkey," and on cross indicated that the monkey sounds occurred "in the 2000s." L.J. Player testified that Mr. Blankenship, a foreman told him and other employees "John Foster going to run some of y'all off, if you have a accident or a derail." Elgie Abner testified that a superintendent, Dan Alger stated to him, "Well, they tell me if I let you-all have the same tools, they'll end up in the pawn shop." Harry Brooks, when asked, "[I]s there any possibility that these supervisors were not aware of these nooses and graffiti in the work place?" responded, "They knew." N. Player testified that the graffiti remained on the walls for "[m]onths, some of them years."

that the court abused its discretion in failing to correct or cure improper statements by Plaintiffs' counsel in opening and closing statements. The court determined, after carefully considering both parties' arguments on the issue and the evidence in the case, that the probative value of the conviction evidence outweighed its prejudicial value.[75] The court also made it clear that it would not tolerate "exaggerated discussion, questions and answers, over and over and over about the conviction of Mr. Moore." For the opening and closing arguments, Defendant points to Plaintiffs' mis-representation of Supervisor Talley's testimony in closing argument (painting it as testimony from the "transcript," while it was in fact testimony from the first trial) and their reference to the Bill of Information from Moore's felony conviction in opening argument, which the court had specifically disallowed. Under abuse of discretion review, we find that none of these actions, if they were in error, resulted in prejudice to Defendant. The jury heard both Talley and Moore testify during the second trial. The jury learned from Moore's testimony that he had paid off all fines related to his conviction and that he was pardoned for his conviction in 1995, although he was not required to "do anything" to receive that pardon. The jury also heard the testimony of many other witnesses who discussed Talley's and Moore's actions and could have reasonably determined, absent the challenged remarks in opening and closing statements, that KCSR was liable for creating and failing to adequately redress a racially hostile work environment.

AFFIRMED.

---

[75] The court determined this despite its recognition that, as Defendant indicates, it based its finding that the conviction was "extremely probative" in the first trial on a finding that Moore had harassed employees and that no evidence from the prior trial showed harassment.